BROWN v. PILLOW (BACON et al., Garnishees).

(Circuit Court of Appeals, Second Circuit. December 7, 1909.)

No. 61.

**1. DAMAGES (§ 18*)—INTERRUPTION OF BUSINESS—REMOTENESS.**

A respondent, who, under a claim of ownership made in good faith, took possession of a dredge being operated by libelant, cannot be held liable in damages on the ground that by reason of such action libelant's employés on the dredge left his service in violation of their contracts, and he was delayed in his work until he could find new men, although he at once retook possession of the dredge; such damages not being the direct and proximate result of respondent's claim but remote and speculative.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 37; Dec. Dig. § 18.*]

**2. GARNISHMENT (§ 162*)—PROCEEDINGS TO SUPPORT—BURDEN OF PROOF.**

Where a garnishee prior to service of citation on him had mailed a check to respondent for the amount in his hands belonging to respondent, which check had been transferred to a third person, the burden rested upon libelant, in order to charge the garnishee, to show that the transferee of the check was not a bona fide holder for value.

[Ed. Note.—For other cases, see Garnishment, Cent. Dig. § 300; Dec. Dig. § 162.*]

**3. GARNISHMENT (§ 164*) — PROCEEDINGS TO SUPPORT — SUFFICIENCY OF EVIDENCE.**

Evidence considered, and *held* insufficient to charge garnishees as debtors of a respondent.

[Ed. Note.—For other cases, see Garnishment, Cent. Dig. § 302; Dec. Dig. § 164.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Isaac T. Brown against Robert L. Pillow. Decree for respondent, and libelant appeals. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The following is the report of the commissioner:

A citation and an alias citation were issued in this action with a clause of foreign attachment, and the marshal made return that he was unable to find the respondent, Pillow, in the district, but had attached moneys of his in the hands of Alexander S. Bacon and the Trust Company of America, garnishees. Respondent, Pillow, having made default in appearing, an interlocutory decree was entered July 3, 1908, whereby it was decreed that Pillow pay libelant's demands out of the property attached, and it was ordered that it be referred to me, as commissioner, to ascertain the damages, and whether in fact and in law Bacon and the Trust Company of America, or either of them, had any property of Pillow in their possession or under their control at the time of the service of the citations on them, respectively.

I hereby report that before me appeared Mr. Walter H. Thacher, proctor for libelant, and Mr. D. Roger Englar, of counsel for libelant, Mr. Alexander S. Bacon, garnishee, on his own behalf, Mr. Morton Stein, also on behalf of Mr. Bacon, and Mr. H. W. Clark, representing Messrs. O'Brien, Boardman, Platt & Littleton, proctors for the Trust Company of America; and I also report that testimony was offered on behalf of libelant and of the garnishee Bacon, which testimony, with the exhibits, is filed herewith; and I further report as follows:

Libelant is a contractor, residing in New York, and respondent, Pillow, is a resident of Texas. From August 29, 1902, until June, 1903, libelant was performing a contract with the Kansas City Southern Railroad Company to deepen a ship canal at Port Arthur, Tex., and in doing the work used a hydraulic dredge, with pontoons, piping and other adjuncts. Libelant testifies that the dredge had a 12-inch hydraulic discharge, was about 80 feet long, was capable of discharging 35,000 cubic yards of material a month, and had a captain, a mate, an engineer, a fireman, a leverman, four deck hands, a cook, and a watch-man. The dredge belonged to Auchincloss Bros. of New York, and libelant testifies that he was using it under an agreement with them that they should have one-half the compensation received for the work over and above the running expenses, which were paid by Auchincloss Bros.

The libel alleges: That on or about September 1, 1902, Pillow wrongfully boarded the dredge, took forcible possession of it under a claim of absolute ownership, notified the crew that they were not entitled to hold it for libelant, induced members of the crew to leave it and libelant's employment "by various false claims and threats," and issued orders to the other members of the crew to prevent libelant from resuming possession, "which orders were obeyed for a considerable length of time, until the libelant finally resumed possession of the said dredge by force"; that thereafter Pillow libeled the dredge in the United States District Court for the Eastern District of Texas, and under the process of that court the marshal seized the dredge and held possession until libelant bonded some 24 hours later; that subsequently Pillow withdrew his suit without going to trial, and abandoned all attempts to establish his claim to the dredge; that by reason of Pillow's "interference with and demoralization of the crew of the said dredge, and the total destruction of all discipline among the crew thereof, and particularly by reason of the loss of the master thereof, who was an expert dredge operator, obtained by libelant with great difficulty and at great expense and who had been driven from the said dredge and induced to leave the libelant's employ by the threats and other wrongful conduct of the respondent above mentioned, the libelant was unable to operate the said dredge for over a month after the abandonment by the respondent of his alleged claim as aforesaid"; and that because of all these matters the dredge "necessarily remained idle for a period of six weeks," exclusive of the period the marshal remained in possession, whereby libelant and Auchincloss Bros. suffered damage in the sum of $3,500.

The libel also alleges, and it was proved, that prior to the commencement of the action, Auchincloss Bros. assigned to libelant all their interest in the claim and cause of action against Pillow.

1. Libelant was the only witness who testified as to Pillow's alleged seizure of the dredge. He testifies that on September 1, 1902, both Pillow and the dredge captain came to him and told him that, under a bill of sale of the dredge from the Morris & Cumings Dredging Company of New York to Pillow,

Pillow had gone aboard at 3 or 4 o'clock in the afternoon, dismissed the crew, put one of them in charge as his representative, and then left, and that the captain reproached libelant with not telling him of the sale of the dredge. The circumstances under which the bill of sale was made are not explained, but there is nothing to show that Pillow did not act in good faith, believing that he had obtained proper title. Libelant testifies that he said to Pillow, "You have bought a gold brick." Libelant also states that after Pillow had taken this action, and on the same day, libelant himself, after consulting counsel, procured two Texans with warlike records, both "armed to the teeth," as he expresses it, put them aboard, and instructed them to "bear out" their records, and repel Pillow at all hazards. According to libelant, he paid one of these men $150 a month and the other $115, and one remained aboard one month, and the other two months. Apparently there was no necessity for such drastic measures. It does not appear that Pillow had used any violence, intimidation, or threats, and his custodian seems to have done nothing to assert his principal's rights, real or supposed, and left the next day, according to libelant. Pillow never went aboard again, and this was the beginning and the end of his disturbance of libelant's possession, except that towards the end of the month the United States marshal arrested the dredge in an admiralty action brought by him, and libelant bonded within 24 hours. Libelant himself went aboard the dredge in the evening of the same day Pillow boarded it, he says, and told the man Pillow had put in charge that Pillow had no right to the dredge. Libelant states that the captain was "in a very sad state" when he reported Pillow's action, and the same night libelant paid him off, and the next day paid off such of the crew as had left. Libelant says that the mate, engineer, fireman, leverman, and deck hands deserted him, in addition to the captain. Although libelant explained to them all that Pillow had no right to the dredge, and no right to discharge them, he states that they said they had seen the bill of sale, and this appeared to them to be decisive. Libelant also testifies that because he had surrendered the plant, instead of defending it, he did not ask the captain to stay, and he did not ask the other men either, because he "could not argue with them, could not reason with them. They did not consider I had anything to do with the dredge."

He also says that, when the marshal came aboard, it "upset everything and made it worse than ever," that "things looked tougher than ever." But it is clear that no such damages as libelant claims can be recovered for the marshal's seizure, since the recovery would be limited to the taxable costs and disbursements in that suit (Henderson v. 300 Tons of Iron Ore [C. C.] 38 Fed. 36). He says that work with the dredge stopped, because he was "down and out" by reason of the loss of his captain and principal men, its operation was not resumed until the 5th or 10th of October, that it was idle about 30 days, during which time he received nothing under his contract, and that then the railroad company, which had built a dredge that was not a success, turned over its captain and crew to him. He testifies that in the interval he made all reasonable efforts to obtain a crew, but without success. He admits that he had continuous possession of the dredge, and states that his inability to work it arose solely from his inability to get men familiar with the operation of a hydraulic dredge. He says that the affair was "the talk of the town and the newspapers," and competent men would tell him he did not own the dredge, that Pillow owned it, "and any argument on my part was just waste of time, because I could not work them around." He also says that, being unable to get men at Port Arthur, he wrote and telegraphed to Tampa for them, went to New Orleans, and put advertisements in the New York Herald and the Engineering News, calling for men of the class required; but elsewhere he says that he did not go to New Orleans, although he "was moving all the time, used to go to Beaumont and hunt up men anywhere I could land some. At that time levermen were a very scarce article." He was called upon to produce the advertisements, but at a subsequent hearing said that he could find nothing but a memorandum of the expense of the telegram to Tampa, but that the advertisements appeared between the 5th and 10th of September, although he had not examined the files of the Herald and the Engineering News to find them.

Under his contract with the railroad company, libelant was to receive 12 cents a cubic yard for material dredged, and the work was to be completed by

November 20, 1902. He says that the railroad company paid him in full for the dredging, although he did not complete until June, 1903, having obtained "an indefinite extension." He claims that he would have earned $4,200 for the month the dredge was out of use, this being at the agreed rate for 3,500 yards, which he says was the engineer's estimate for the preceding period. But he produced a statement which he testifies the railroad company furnished him for the period between October, 1902, and April, 1903, both inclusive. Omitting October, when the amount of material dredged was 17,021 yards, the statement shows a monthly average of 26,558 yards for six months, and total gross earnings for that time, $17,206.99, or $2,867.83 a month. According to his testimony, the amount saved on wages and board of the men was $340, $200 for fuel, $200 for water, and $50 for repairs. These items amount to $790, making the net earnings alleged to have been lost through Pillow's action $2,077.83.

Assuming that work was suspended through the desertion of his men, and that he could not replace them with diligent effort, it is very doubtful, upon libelant's own testimony, that the desertion was brought about by Pillow's claim to the dredge. Libelant says that at that time the refiners were seeking skilled labor at Port Arthur for the oil fields, "they gobbled up" every man that appeared. "We hired them by the month, but you could not hold half of them half the time down there. They were always skipping off to those oil fields. That is what gives me all this trouble." He further says that his men would go into town at night and "get in with the crowd" from the oil wells, and drink more or less, although he adds that "with the good men, my engineer and fireman, they were only too glad to stay. They were paid pretty fair wages." If he was prepared to continue their wages, it is incomprehensible that they should have refused to remain merely because Pillow made a claim of ownership. But even if a man did leave because of Pillow's action, the loss libelant thereby suffered was not the natural and proximate result of Pillow's claim of title, and the damages sought to be recovered are remote and speculative. Libelant says that his men were hired by the month. If they left before the term of hiring had expired for the reason he asserts, his damages arose out of their breach of contract, not because Pillow asserted title to the dredge. Cases are cited by libelant's counsel to sustain the claim, among them Aldridge v. Stuyvesant, 1 Hall (N. Y.) 235, Scidmore v. Smith, 13 Johns. (N. Y.) 322, and Covert v. Gray, 34 How. Prac. (N. Y.) 450. The first was an action for wrongfully and maliciously disturbing plaintiff's tenants so that they left the premises. The second was an action for enticing away and harboring plaintiff's servant. The third was for enticing away plaintiff's son and inducing him to enlist in the army. Lumley v. Guy, 2 El. & B. 216, and Jersey City Printing Co. v. Cassidy, 63 N. J. Eq. 759, 53 Atl. 230, are also cited. The last was an injunction suit brought against strikers. None of these cases apply. The act of the defendant in each was malicious, and the damages the direct and natural result. When viewed in the most favorable light, libelant's testimony would merely sustain a finding that his men deserted because they believed Pillow's assertion of ownership in preference to libelant's denial of it. In that event, the cause of action, if any, would be for slander of title to personal property, and such an action would not be recognizable in admiralty. Indeed, on the facts here it would appear that the absence of malice on the part of Pillow would be a fatal obstacle to the maintenance of the action even in a court of law. Like v. McKinstry, 3 Abb. Dec. (N. Y.) 62, 66; Id., *43 N. Y. 397; Hovey v. Rubber Tip Pencil Co., 57 N. Y. 119, 15 Am. Rep. 470; Lovell Co. v. Houghton, 116 N. Y. 520, 22 N. E. 1066, 6 L. R. A. 363. I do not agree with libelant that it is unnecessary to prove his cause of action. Pillow not having been personally served with process, it would seem that such proof should be made, as under the state practice in similar cases. Code Civ. Proc. § 1216.

Libelant never made a demand on Pillow before bringing suit nearly six years after the occurrence, when Mr. Bacon, as attorney, collected the amount of the judgment against the Morris & Cumings Dredging Company hereinafter mentioned. May 20, 1904, libelant wrote Pillow that he had decided to commence an action against the Morris & Cumings Dredging Company for damages in connection with the sale of the dredge, and he would like to know whether Pillow had settled his matters with them, adding, "It may be that we can aid one another."

2. Although I have found that libelant has proved no damages, and the opinion upon which the order of reference was entered does not require me to consider the questions presented as to the attachment unless I find that there is something due libelant, the order itself directs me to consider both matters, and the question whether the garnishees hold any property of the respondent Pillow will become important in the event of the court's not sustaining my conclusion as to the damages.

February 7, 1903, Pillow made a written assignment to James A. Dumont, Jr., of all his right, title, and interest in a claim against the Morris & Cumings Dredging Company, for failure to deliver the dredge, for work, labor, and services, and for money paid at that company's request for its use and benefit, and he authorized Dumont to bring suit therefor. This suit was brought in the New York Supreme Court, Westchester county, and resulted in a judgment for Dumont which was subsequently affirmed by the Appellate Division[1] and the New York Court of Appeals.[2] This judgment was paid to Mr. Bacon, who was the plaintiff's attorney in the action May 26, 1908, by a check of the Morris & Cumings Company for about $10,000 to the order of its attorney in the action, and indorsed by him to Mr. Bacon; the amount of the check covering the damages, interest, and costs. Mr. Bacon had this check certified, indorsed it, deposited it in his personal account with the Trust Company of America, and on the 29th day of May drew and mailed to Pillow at Galveston, Tex., his check on the Trust Company of America for $6,000 to the order of Pillow. On June 1st Mr. Bacon was served with the citation in the present action, directing the marshal, in case Pillow could not be found, to attach his credits and effects to the amount of $3,500, in the hands of Dumont, the Morris & Cumings Company, and Mr. Bacon, and on June 4th an alias citation was served on the Trust Company of America, directing the attachment of Mr. Bacon's account to the same amount; the citation stating that moneys in that account belonged to Pillow. Mr. Bacon's check represented the amount of the collection he made, over and above his fees and disbursements. Pillow deposited Mr. Bacon's check with Hutchings, Sealy & Co., Bankers, at Galveston, on June 4th, the sum of $101.08 was drawn on it from the bankers, and the remainder was deposited in an account which was opened with them in the name of C. M. Pillow's wife, but which he states in a letter to Mr. Bacon was in fact his own account. The check was forwarded by the bankers to the City National Bank of this city for collection, and that bank presented it to the Trust Company for payment, June 8th.

The check bore the successive indorsements of Pillow and Hutchings, Sealy & Co., both under date of June 4th, and the National City Bank under date of June 8th; but payment was refused by the Trust Company because of the attachment, the check was protested for nonpayment, was returned to Hutchings, Sealy & Co., and by them charged against Mrs. Pillow's account.

The assignment to Dumont was made for the purpose of vesting the title to the cause of action in a resident of the state and of Westchester county to facilitate prosecution of the action against the Morris & Cumings Dredging Company, but Mr. Bacon was retained by Pillow, and the suit was prosecuted on behalf of Pillow, who was the real client and the real party in interest. The $101.08 advanced by the Galveston bankers has been repaid to them, and on July 14th Mr. Bacon paid them $2,500, apparently the balance of the $6,000 over and above the $3,500 attached, and it was indorsed on the check as a payment on account, and credited to the account of Mrs. Pillow. The sum of $3,500 which was attached still remains in the trust company, but the check of Mr. Bacon was not certified or accepted by the trust company, and it owes nothing to either Pillow or his wife; if the attachment were withdrawn, and the Trust Company still refused to pay the check, neither Pillow nor his wife would have a right of action against it. In regard to Mr. Bacon, it is suggested by him that he was the debtor of Dumont, not of Pillow, and although he assumed that the proceeds of the judgment belonged to Pillow, and acted accordingly, this assumption would be no defense to an action brought against him by Dumont. But it sufficiently appears from Mr. Bacon's testimony that the money did not belong to Dumont, and, although the case is not one of fraudulent transfer of the garnishee's debt, I think that it comes within the principle of Prentice v. U. S., etc., Co. (D. C.) 78 Fed. 106. But if Mrs. Pillow was a bona fide holder

---

[1] 118 App. Div. 898, 103 N. Y. Supp. 1124.  [2] 192 N. Y. 553, 85 N. E. 1108.

of the check for value, she could sue Mr. Bacon on it and recover the $3,500, even if she should pay that sum into court under its order. She is not a party to this suit, or to the attachment proceeding, and would not be bound by the determination of the court in this action. Neither she nor Pillow has been examined, and she is not shown to have sanctioned or assented to the statement in Pillow's letter. As against her, there is nothing to show that she did not give full value for the check. As I view it, it devolves upon libelant to show that she is not a bona fide holder for value before Mr. Bacon can be required to pay over any part of the money attached in his hands. In the absence of anything concluding her, Mr. Bacon might be compelled to pay the money twice. In the case above cited, which involved the ownership of a note of the garnishee, Judge Brown imposed upon the garnishee the burden of meeting a situation analogous to this; but there the garnishee, as president of a company which was the payee of the note, apparently participated in the transfer of his note. As Mr. Bacon had nothing to do with the transfer of his check, or of the money represented by it, to Mrs. Pillow, and knew nothing about that transaction, there is no reason why he should be compelled to assume the burden. Libelant examined at Galveston one of the bankers with whom Mr. Bacon's check was deposited, but did not examine either Pillow or his wife, although the notice of examination served upon the garnishees named them both as witnesses to be examined.

### Conclusions.

I therefore find:

1. That libelant has failed to prove any damages against respondent other than nominal damages.

2. That the Trust Company of America had no property of the respondent Pillow in its possession or under its control at the time the citation was served upon it.

3. That libelant has failed to prove that Alexander S. Bacon had any property of the respondent, Pillow, in his possession or under his control at the time the citation was served upon him.

All of which is respectfully submitted.

Walter H. Thacher (H. S. Harrington and D. Roger Englar, of counsel), for appellant.

Morton Stein (A. S. Bacon, of counsel), for appellees.

Before LACOMBE, COXE, and WARD, Circuit Judges.

PER CURIAM. Decree affirmed on report of the commissioner.