## LA NORMANDIE.

### LA COMPAGNIE GENERALE TRANSATLANTIQUE v. O'SULLIVAN et al., (two cases.)

(Circuit Court of Appeals, Second Circuit. October 17, 1893.)

1. COLLISION—FOG—EXCESSIVE SPEED.
    A speed of over 10 knots an hour, in a dense fog, near the entrance to New York harbor, is excessive, and renders the steamer liable for a collision, unless it is affirmatively shown that such speed did not contribute to the collision. 43 Fed. Rep. 151, affirmed.

2. SAME—SUFFICIENCY OF CREW.
    If the number of officers and crew of a vessel on deck when a collision is impending is sufficient to perform all the duties required of her, it is immaterial that more are not there.

3. SAME—EVIDENCE—FINDINGS—APPEAL.
    The finding of the trial court, on the testimony of the officers and crew of a vessel, that she was sounding her fog horn and showing lights at the time of an impending collision, will not be reversed on appeal merely because the officers of the other colliding vessel, however alert, failed to see or hear such signals through the dense fog.

4. SAME—STEAM AND SAIL—SAIL HOLDING COURSE.
    A sailing vessel is under no duty to disregard the rule requiring her to hold her course merely because, being in a dense fog, the bearing of an approaching steamer, as ascertained by her fog signals, does not perceptibly change.

5. SAME—DAMAGES—TOTAL LOSS.
    Where a New York harbor pilot boat is sunk by a collision which cuts her half through on the port bow, the utter refusal of one wrecking company to attempt raising her, and of another to do so except for $3,000 contingent on success, without regard to value when raised, is sufficient to warrant a finding that she is a total loss.

6. SAME—VALUE—HOW DETERMINED.
    Where a vessel sunk in a collision is of a kind which is seldom bought and sold, so as to establish a market value, as in the case of harbor pilot boats, which are of little use for other purposes, its value may be established by evidence as to original cost, age, probable future life, and the like.

**7. ADMIRALTY—DISCRETION OF COURT—TWO LIBELS FOR SAME CAUSE.**

It is within the discretion of an admiralty court to entertain two libels for the same cause of action,—one in personam, and the other in rem,—where it renders a decree in favor of libelants in the former, and suspends the entry of a decree in the latter until it is ascertained whether it will be necessary to recur to the security given in the suit in rem.

**8. COLLISION—PILOT BOAT—STRANGER ON BOARD.**

A vessel which, through its own sole fault, collides with a pilot boat, is liable for consequent loss of property belonging to a person on board the latter as a passenger for his own pleasure, free of charge.

Appeals from the Circuit Court of the United States for the Southern District of New York.

In Admiralty. Libel in personam by James O'Sullivan and others against La Compagnie Generale Transatlantique, owner of the steamship La Normandie, for the loss of libelants' pilot boat, Charlotte Webb, by collision with the steamship; also, libel in rem by the same libelants and one Green against the steamship for the same collision. The suits were tried together in the district court, and a decree for libelants was rendered in the suit in personam, while in the suit in rem a decree for libelant Green only was rendered, and the entry of any decree in favor of the other libelants was suspended until the further order of the court. See 40 Fed. Rep. 590; 43 Fed. Rep. 151. Respondent appealed to the circuit court, which affirmed, pro forma, the decrees of the district court; and respondent again appeals to this court. Affirmed.

Mr. Govin, for appellant.

Mr. Ledyard, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The first of these causes is an action brought by the owners of the pilot boat Charlotte Webb, and by her crew, against the owner of the steamship La Normandie, in personam, for loss of said pilot boat, and of their personal effects thereon, which were sunk in a collision between the Charlotte Webb and the said steamship about eight miles east of Sandy Hook light-ship. The district court entered a decree for the total sum, including costs, of $15,246.32, against the respondent.

La Normandie is one of a regular line of steamers plying between New York and Havre, and is owned by La Compagnie Generale Transatlantique, a French corporation. She is an iron steamship of the first class, 459.3 feet long, and about 9,000 tons displacement. Her average speed, when loaded, is about 16 knots per hour. About midnight of the 18th of May, 1889, she was proceeding on a voyage from New York to Havre, having left a temporary anchorage a little outside of Sandy Hook, where she had stopped on account of fog, at 10 P. M. Her course was east by south. Her lights were properly set and burning. Her steam siren was sounded regularly. The captain and first lieutenant were on the bridge. She had two lookouts forward on the bow, another just abaft of them, and a

fourth aloft on the fore yard. There was a dense fog, and the speed of La Normandie, according to her own testimony, was between 10 and 11 knots per hour. The district judge found it "not much less than twelve knots." She was navigating in the track of vessels inward and outward bound to and from the port of New York, and but a few miles from its entrance; a place where, in view of the magnitude of that commerce, there is always danger of meeting or overtaking other craft. There was a light wind from about the southeast, blowing a two-knot breeze. At midnight, those engaged in the navigation of the steamer heard a sharp explosion of a bomb, accompanied by rapidly successive blasts of a fog horn, proceeding from right ahead. When he first heard this alarm, the captain of La Normandie ordered the engines slowed. Afterwards, upon hearing the fog horn more distinctly, and nearer, he had the engines put full speed astern. On hearing the first signal from the pilot boat, the course of the steamer was changed to starboard. Before her headway could be fully arrested, however, she collided with the Charlotte Webb at about right angles, striking her in the forward rigging on the port side, from the effects of which she almost immediately sank, two of the persons on board of her being drowned.

The district judge held that the steamer was in fault (1) for excessive speed; and (2) for not reversing immediately on hearing the sounds ahead of her,—to both of which findings, appellant assigns error. Discussion of the second of these assignments of error is unnecessary, as the undisputed facts of the case abundantly sustain the finding that the speed of the steamer—over 10 knots per hour through a dense fog—was excessive. However individual opinions may differ, whatever may be the judgment of experts, however foreign tribunals may have decided similar cases, this question of high speed in a fog is no longer an open one in the federal courts, when the steamer is navigating in a place where the presence of other vessels may reasonably be expected. The Pennsylvania, 19 Wall. 125; The Bolivia, 1 C. C. A. 221, 49 Fed. Rep. 169. The steamer failed affirmatively to show that her high rate of speed in no way contributed to the collision, and the district judge rightly held her in fault.

The appellant contends that the pilot boat was in fault because (1) she was sailing shorthanded in a dangerous place; (2) she did not have a sufficient lookout; nor (3) sound a fog horn as required by law; nor (4) carry and exhibit the lights required by law; and (5) did not, after discovering the steamer, take any precaution to avoid the collision.

A great deal of testimony was taken in the district court; most of the witnesses, including the more important ones, being examined in court. The district judge has elaborately discussed that testimony, and, as no new evidence was introduced in this court, that branch of the case may be briefly disposed of.

When the first whistle of the steamer was heard, there were but two persons on the deck of the Charlotte Webb,—Capt. Scott, who was at the wheel, and in charge of the watch, and Olsen, who was

the lookout, and blowing the fog horn. But there can be little doubt, upon the evidence, that the first whistle was heard 15 minutes or more before collision, and Scott testifies that, after six or eight of these signals were heard, (they were concededly sounded at intervals of about a minute,) Pilot Hammer was called up, and he called up Pilot Hines. Upon hearing the steamer's whistle, the duty of the sailing vessel was to hold her course, to give her own signals, and to keep a careful lookout. If the number of her officers and crew on deck and available were sufficient to perform all the duties required of her, it is immaterial that more of them were not there. The main conflict of evidence in the case is as to whether or not the signals which the law requires were given by the pilot boat. The respondent's witnesses testify that no signal was seen or heard until just a few minutes before La Normandie actually struck her. But the testimony of the libelants is direct, positive, and circumstantial that the fog-horn signals were sounded,—the pilot boat replying regularly to the steamer's whistles,—and that, besides the bomb whose explosion was heard on the steamer, another bomb was fired from one to three minutes earlier; that after each bomb a flash light was shown on the port side; that the pilot boat used a mechanical fog horn; and that the bearing of the steamer was correctly noted, and her approach through the fog carefully watched for. Upon this state of the proof, the conclusions of the trial judge, before whom the more important witnesses were examined, are not to be set aside because those in charge of the navigation of the steamer, however carefully they may have been discharging their duties, heard no signal and saw no light, especially when the existence of a dense fog may well have operated to deaden the sound and obscure the light. Nor are we satisfied that the pilot boat is to be condemned because, after hearing or after sighting the steamer, she did not change her own course. The twenty-third rule required her to keep her course; and although there are cases when the navigator of a sailing vessel meeting a steamer is warranted in departing from that rule, and when good seamanship requires him to do so to avoid immediate danger, they are much clearer ones than this, where the location of the steamer was to be made out by the bearing of her signals through the fog, and where, although that bearing had not perceptibly changed, no one could tell but what the very moment chosen by the schooner for a change of course would be the same moment when the steamer, appreciating at last the presence of the schooner, would change her own; and when still less could any one foresee whether such change by the steamer would be to port or to starboard. We are of opinion, therefore, that the steamer, alone, was in fault for the collision.

The appellant further contends that the commissioner erred in reporting, and the district court in confirming the report, that the pilot boat was a total loss, assessing her value at $11,500. The vessel was sunk in the Atlantic ocean, some seven miles east by south of Sandy Hook light-ship, in 13 fathoms of water, after a blow by the steamer's bow which cut into her port side, and pene-

trated about halfway through her. One wrecking company, to whom the managing owner applied, declined to undertake to raise her. Another one refused to do so for any percentage of her value when raised, but offered to make the effort for the sum of $3,000, contingent upon success, and without regard to the value of the vessel as saved. We do not find in the evidence sufficient to differentiate the case from Pratt v. The Havilah, (2d Circuit,) 1 U. S. App. 138, 1 C. C. A. 519, 50 Fed. Rep. 331. The vessel being a total loss, the owners were entitled to her value at the time of the destruction.

Where purchases and sales of property are sufficiently frequent to give a market value, the ascertainment of that market value is the usual and most convenient way of determining the actual value. In the case at bar, we are of opinion, however, that the evidence entirely warrants the conclusion of the commissioner that pilot boats, such as the Charlotte Webb, are very rarely sold and very rarely change hands, unless shipwrecked or stranded; such vessels being, as one of the steamer's witnesses testified, "really not serviceable for any purpose but pilot boats, whereas most other vessels can be utilized for other purposes." In such cases there is no hard and fast rule prescribing the method in which the actual value shall be computed. It is always a difficult question to decide, and in the case at bar the conclusion reached by the commissioner, after taking a great deal of testimony as to the cost of such a vessel, her adaptability for the service in which she was employed, her condition at the time of the collision, the value of her equipment, her age, and probable future of useful life, viz. that she was worth $11,500 on the night of the collision, seems to us reasonable.

The second of these causes is a proceeding in rem brought against La Normandie by the parties libelant in the first suit, and an additional libelant, one Green, who was on the Charlotte Webb, not as one of the ship's company, nor as a passenger for hire, but, upon the invitation of one of the owners, as a voyager for pleasure. The circumstances under which this second proceeding was brought are these: The collision happened while La Normandie was outward bound. Promptly thereafter the libelants proceeded against her owners, who were found here, and duly served. Inasmuch as, in that suit, they were unable to obtain any special security for the amount of their possible recovery, they subsequently, when La Normandie returned to this port, filed a libel in rem against her, (in which libel, Green, who was not a party to the first proceeding, joined,) and thus compelled the giving of security. The appellant objected to the maintenance of two suits for the same cause of action, moved for a stay of proceedings in the suit in personam, and filed exceptions to the libel in the suit in rem. The district court overruled all such objections and exceptions in an opinion which is reported 40 Fed. Rep. 590. We do not deem it necessary to discuss the questions thus raised. Both suits were pending before the same judge in the same court. He tried them together, and, upon completion of the proof, entered a decree in the suit in personam in favor of the libelants in that suit, as above indicated, and a decree

in the suit in rem in favor of Green, only, for $381.60, including costs, suspending the entry of any decree in that suit in favor of the other libelants until the "further order of the court," should failure to realize the fruits of success in the suit against the owners make it necessary to avail of the security given for the ship in the suit in rem. Thus, there has been but one decree in favor of any libelant, and there can be but one satisfaction. We cannot see that any rights of the appellant have been violated by this disposition of the suits, which was a matter of discretion in the district court, as to its own procedure.

The objection to the testimony of the lookout, Olsen, taken in the proceeding in rem before a commissioner, is highly technical, and without merit. And the same may be said of the contention that Green is not entitled to recover because he was not one of the ship's company, nor a passenger in a public conveyance; that the pilot boat ought not to have had such a person as Green on board at all; and that the navigators of the steamer had no reason to suppose any such person would be found in such a vessel. We know of no rule of law which forbids the owners of vessels to carry whom they please with them, whether the persons so carried pay for their carriage or not. Nor do we see upon what principle the vessel whose negligent navigation is the sole cause of a catastrophe involving the destruction of another vessel, and all the property on board of it, is to escape liability for the consequent loss to one of the owners of that property, who may be sailing the high seas in such other vessel for his own health or pleasure, and without paying for his voyage. The cases cited touching the liability of a railroad to a person traveling in its cars on a free pass, or riding in a freight car contrary to regulations, or walking upon its track, are wholly inapplicable.

We see no reason to disturb the commissioner's finding as to the value of the personal effects belonging to Green which were lost with the pilot boat. While the evidence was not sufficient to support his full claim, there is abundant to warrant the conclusion that they were worth $250. The commissioner discredited the witness' estimate as to the amount of cash he had with him, and thought his valuation of his property excessive, but that is no reason why he might not, as he did, credit the statement that he lost the property he described; and the commissioner's valuation, as found, seems reasonable.

The decrees of the circuit court are affirmed, with interest and costs.