ALASKA S. S. CO. v. INLAND NAVIGATION CO.

(Circuit Court of Appeals, Ninth Circuit. February 2, 1914.)

No. 2276.

COLLISION (§ 133*)—SUITS FOR DAMAGES—DAMAGES—TOTAL LOSS OF VESSEL.

In case of the total loss of a vessel in collision, solely through the fault of the other vessel, the measure of damages recoverable by her owner is her market value where she has such a value and it can be shown. If she was of an ordinary type of construction, in general use, and for which there was a market, the measure of her value is the price at which she could have been sold in the market, which may be shown by the opinions of competent witnesses, and her original cost with a deduction for depreciation may only be resorted to as fixing her value where a market value cannot be shown.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 287; Dec. Dig. § 133.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Clinton W. Howard, Judge.

Suit in admiralty for collision by the Inland Navigation Company, as owner of the steamship Telegraph, against the steamship Alameda; the Alaska Steamship Company, claimant. Decree for libelant, and claimant appeals. Reversed.

It is alleged in the libel filed by the Inland Navigation Company that on the night of April 25, 1912, while its steamship, the Telegraph, was lying at her berth in good safety on the north side of the Colman Dock in the city of Seattle, Wash., the steamship Alameda, through the gross negligence of the crew of her engine room, and in direct violation of the orders of her master, was driven at great speed head on against the south side of the Colman Dock, and completely through said dock, and the stem of said steamship Alameda was driven into the side of the hull of the said steamship Telegraph causing the latter to sink and founder; that as a result of said collision and of the ramming and sinking of said steamship Telegraph she became and was a total loss; that said collision, ramming, and sinking of said steamship Telegraph was without any fault, neglect, or wrongful act on the part of said steamship Telegraph or any of her officers or crew, but was due wholly to the fault of the said steamship Alameda.

The libelant further alleged that said steamship Telegraph immediately prior to the time of said collision was of the value of $55,000; that as a result of said collision and sinking she became of no value whatsoever; and that the libelant was thereby damaged in the sum of $55,000.

In the answer filed by the respondent the allegations of the libel with respect to the circumstances surrounding the collision between the steamships Alameda and Telegraph were not denied, nor did the respondent deny liability for the damages sustained by the Telegraph. But the respondent did deny that the steamship Telegraph immediately prior to the time of said collision was of the value of $55,000, and further denied that the libelant, as a result of said collision and sinking of its steamship, the Telegraph, had been damaged in that sum.

The cause was referred to a United States commissioner for the taking of testimony. The testimony was returned into court by the commissioner, and thereafter a final decree was entered by the court below in favor of the libelant and against the respondent for the sum of $45,000, from which final decree the respondent has appealed to this court.

W. H. Bogle, Carroll B. Graves, F. T. Merritt, and Laurence Bogle, all of Seattle, Wash., for appellant.

Ira Bronson and J. S. Robinson, both of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). Neither the pleadings nor the evidence in this case raise any issue with respect to the liability of the appellant for the damages suffered by the appellee through the loss of its steamship, the Telegraph. It is admitted by the appellant that the sinking of the Telegraph was caused by negligence and fault on the part of the Alameda, and it is also admitted by the appellant that by reason of such sinking the Telegraph became and was a total loss.

But the contention of the appellant is that the court below erred in finding and decreeing that the value of the steamship Telegraph at the time of her loss was the sum of $45,000, or any sum in excess of the sum of $25,000. The amount which the appellee is entitled to recover

as the value of the Telegraph at the time she was sunk by the Alameda is the only question we are called upon to determine.

In fixing the sum of $45,000 as the value of the Telegraph at the time she was sunk, the court below proceeded upon the theory of original cost, allowing for the difference of her upkeep and the natural fair depreciation of her hull, engines, house, and equipment. It is insisted by the appellant that the court erred in adopting this method of computation; that the rule of market value should have been followed; that the testimony showed that there was a market for vessels of the type of construction of the Telegraph; that the testimony further established the fact that the market value of the Telegraph at the time she was sunk would not have exceeded $25,000; and therefore the rule of market value should have been adopted by the court in fixing the value of the Telegraph at the time she was sunk. The appellee contends, on the other hand, that, under the circumstances of this case, the market value of the vessel did not measure the damage.

1. That a ship may have a market value, and that such market value, if made to appear, must be used as the basis for computing the amount of damages with which the owner of a negligent vessel is chargeable in a case where, through such negligence, another vessel has been sunk and the owners thereof have sustained a total loss, is a rule laid down by all writers on maritime law.

In Lowndes, Admiralty Law, p. 140, the method of computing the damage to persons who have suffered loss by reason of a collision resulting from faulty conduct on the part of the other ship is stated in the following terms:

"The general principle governing the computation of damages is that the sufferer by a collision which is the result of wrongdoing, whether negligence or mistake, is entitled to 'restitutio in integrum'; he is, so far as practicable, to be restored to the same pecuniary position as if no collision had taken place. * * *

"In the case of a ship totally lost, the owner is entitled to recover the actual value, and this is defined in the admiralty courts to be her market value; that is to say, the gross sum for which she might have been sold immediately before the collision."

In support of this rule the author cites the decision of Dr. Lushington, in the case of The Clyde, Swabey, p. 23. In that case the celebrated admiralty judge said:

" * * * Wherever damage is done by one vessel to another, the parties are to be restored into the same state as they were before the accident; that is to say, they are to have the full value of the property lost; restitutio in integrum is the leading maxim. The value is the market price at the time of the destruction of the property, and the difficulty is to ascertain what would be its market value. * * * In order to ascertain this, there are various species of evidence that may be resorted to; for instance, the value of the vessel when built. But that is only one species of evidence, because the value may furnish a very inferior criterion whereby to ascertain the value at the moment of destruction. The length of time during which the vessel has been used, and the degree of deterioration suffered, will affect the original price at which the vessel was built. But there is another matter infinitely more important than this—known even to the most unlearned—the constant change which takes place in the market. It is the market price which the court looks to, and nothing else, as the value of the property. It is an old saying, 'The worth of a thing is the price it will bring.'"

In the nature of things, the market for ships is different from the market for more numerous articles of lesser value; nor is the market value of a ship so readily ascertainable as the market value of an article of merchandise whereof daily sales are made and daily prices quoted. And with ships, as with other articles, one might have a peculiar value—a value above that which it would ordinarily have—on account of its adaptability for a special purpose, or on account of possession of some extraordinary qualification, as that of speed. This rule, with the exception, is stated by Roscoe, in his work on Damages in Maritime Collisions, as follows (page 24):

"When a vessel is totally lost by a collision with another vessel, which was caused by the negligence of those in charge of such other vessel, in order to place * * * the owner of the innocent ship as nearly as possible in the same position as he was before the collision, he should recover from the owner of the wrongdoing vessel the value of the lost ship. In most cases this value is the market value, having regard to the age, character, and condition of the ship. 'It is the market value which the court looks to, and nothing else, as the value of the property. It is an old saying: "The worth of a thing is the price it will fetch."' Dr. Lushington, in The Clyde, 2 Swa. 25. Market value must, however, be distinguished from anything like a forced sale value, for the value for the purposes of compensation is that which a willing seller and a willing purchaser would place upon a ship. While also the above statement of Dr. Lushington, as well as the adage, may be admitted to be correct generally, it is obvious that some vessels may have a value peculiar to themselves, having regard to their use, or the position or occupation of the owner. Therefore, if either owing to the absence of a market, or the peculiar or special character of her trade or work, the lost ship cannot fairly be valued at a market price, then the basis of assessment is the value of the vessel to her owners as a going concern."

## In Marsden's Collisions at Sea (6th Ed.) p. 101, it is said:

"If the ship is totally lost, the owner is entitled to recover her market value at the time of the collision. * * * Where the ship is of a special construction or character, and although of special value to her owner, has little or no market value, damages must be estimated by considering what is her value to the owner as a going concern at the time she was lost. Her original cost, her condition at the date of her loss, money spent in upkeep, and her past earnings, have all to be considered."

## In the Treatise on the Law of Maritime Collisions, by Herbert R. Spencer, we find the following (section 200):

"Restitution is the rule in all cases where repairs are practical, and compensation when the loss is total. The measure of damages in case of total loss is the market value of the vessel at the time of the collision, together with its cargo and freight, and such other losses as are a direct result of the collision. The market value of the vessel, and not its real or intrinsic value or cost of construction, is ordinarily the measure of damages. The recovery is limited to the market value, and damages in excess of such value may not be assigned by reason of additional value to the owner, owing to peculiar fitness for the trade in which it is engaged, or otherwise; nor is the market value to be determined by what the owner would have been willing to take for the vessel, but it is the amount for which the vessel would have sold in the open market. * * *

"When the conditions are such that no market value can be shown where there is no market value, or, if shown, it is so manifestly disproportionate to the intrinsic value of the vessel that to order a sale at such a price would be a hardship, the court may adopt as the value of the ship the cost of construction with proper deduction for the deterioration in its value from the time of construction; especially may this method be resorted to if the vessel is but recently built."

In Dobree v. Schroder, 2 My. & Cr. 489, the High Court of Chancery of England had before it the question of the value of a vessel under the act of Parliament limiting the liability of a shipowner for any damage done by his ship to any other vessel. The case was one of a collision where a ship had been run down and sunk by a steam vessel. The question was as to the value of the vessel causing the loss of the ship. The accident occurred on the 3d day of November, 1831. The Vice Chancellor had referred the case to the master to ascertain what was the value of the offending vessel at the date of the accident. The master proceeded to find the value of the vessel upon evidence of her original cost, her age at the time of the accident, and her estimated value upon an inspection made in July, 1833. This valuation was brought before Lord Chancellor Cottenham by way of appeal. The argument on the appeal turned upon the question whether the value of the vessel causing the loss was to be ascertained by taking the cost price and then making deductions from that price for wear and tear calculated at certain rates; or by evidence as to the price at which she could have been sold in the market at the time of the accident. This is the identical question of value involved in the present case. The Lord Chancellor in discussing this question said:

"The object of the act of Parliament was to provide that the owners of the vessel should not be liable beyond the value of the property engaged in the adventure at the time at which the accident happened; that is, the value which the property occasioning the loss or injury was capable of producing. In the common acceptation of the term, the value is the price which the property would fetch."

The Lord Chancellor, after discussing the case, concluded that the proper valuation was the market value at the time of the accident, and that the method of value followed by the master, namely, cost price less deduction for wear and tear, was upon the wrong principle.

In the case of The Colorado, Fed. Cas. No. 3029, this English case was referred to as authority in a case involving the question of the value of a vessel which had been sunk in a collision and had become a total loss. The court held that:

"The correct rule upon this subject, when the vessel is a total loss, seems to be that the market value of the vessel just before the collision is the proper measure of damages; that the best evidence of such value is the opinion of competent persons who knew the vessel shortly before she was lost; and that the next best evidence is the opinion of persons conversant with shipping and the transfer of vessels. There are, of course, exceptions to this rule, as when the vessel lost, from some peculiarity of construction in order to adapt her to some special purpose out of the usual course of shipping, precludes there being any market value for her. An instance of this may be when a vessel is built for a special trade requiring peculiar and unusual conditions in her construction. In such a case, for want of a better criterion of value, cost of construction or purchase price, with a deduction for depreciation by ordinary wear and age, may be resorted to. See Lowndes, Coll. 141–146. But the present case does not fall within the exception. The commissioner had before him both classes of evidence stated in the rule, and, although the evidence may be open to criticism in some respects, I think it was amply sufficient to justify the finding."

This case was taken on appeal to the Circuit Court of the United States, and then to the Supreme Court of the United States. The Colorado, 91 U. S. 692, 23 L. Ed. 379. In both courts the decree of the District Court was affirmed, but without any discussion of the question of value of the lost vessel.

In The Granite State, 70 U. S. (3 Wall.) 310, 18 L. Ed. 179, the question was as to the value of "an old and pretty rotten barge" sunk by the steamer Granite State. The statement of the case contains the following recital:

"The commissioner fixed the value of the barge at $850, assuming apparently that she was worth this sum to her owners; though he stated that having been built for a special and unusual purpose, and being, unlike every other sort of craft, used in the port of New York, he had difficulty in forming any estimate. The difficulty, in truth, was obvious; some witnesses swearing that the boat was not worth having for a gift, others that she was worth $8 or $10, and others that in her former condition she could be made practically very useful. There was conflict in the testimony here as in the other part of the case. This report was set aside, and a new estimate directed. On new evidence the commissioner gave $150 more. This report, too, was set aside, and a third reference ordered; the court directing the commissioner to consider the actual cost of raising and repairing the barge and so putting her as near as could be into her former state. A report made on this basis was confirmed."

What that report was, as to the value of the barge, does not appear in the case as reported; but the rule as followed by the District Court was held by the Supreme Court to be the correct rule under the circumstances of the case. There does not appear to have been any evidence as to the market value of the barge. In commenting upon this feature of the case the court said:

"There seems to have been some controversy in the District Court as to the measure of damages. No less than three different reports were made by the master on the subject. * * * There cannot be an establishd market value for barges, boats, and other articles of that description, as in cases of grain, cotton, or stock. The value of such a boat depends upon the accidents of its form, age, and materials; and, as these differ in each individual, there could be no established market value. A person may make considerable profits by the use of an old hulk of little value in the market for vessels. His loss cannot be measured by the ratio of her profits, as he might supply himself with another at a much cheaper rate. But when the injured vessel is not a total loss, and is capable of being repaired and restored to her original situation, the cost necessary to such repair cannot be said to be an incorrect rule of damages."

The appellee cites this case in support of the rule followed by the court below, but it is manifestly not applicable. The broad statement that "there cannot be an established market value for barges, boats, and other articles of that description" must be considered with respect to the character of the barge in question. It was stated to be a "rotten hull." It must also be considered with the qualification, "as in cases of grain, cotton, or stock." It must also be considered in connection with the further qualification that the injured barge was not a total loss, but was capable of being repaired and restored to her original situation. The rule in such case, where there is no evidence as to market value, and the loss was not total, cannot be followed where the loss is total and there is evidence as to market value.

In the subsequent case of The Baltimore, 75 U. S. (8 Wall.) 377, 19 L. Ed. 463, the Supreme Court followed the rule of market value. Mr. Justice Clifford, delivering the opinion of the court in that case, said:

" * * * If the vessel of the libelants is totally lost, the rule of damages is the market value of the vessel (if the vessel is of a class which has such value), at the time of her destruction."

No case has been called to our attention where the court has since modified or changed that rule.

See, also, The New Jersey, Fed. Cas. No. 10,162; La Normandie, 58 Fed. 427, 431, 7 C. C. A. 285; The Pennsylvania, Fed. Cas. No. 10,948; The Hamilton (D. C.) 95 Fed. 844, 845; The Lucille (D. C.) 169 Fed. 719, 721; The Utopia, 16 Fed. 507, 509.

These authorities admit of no doubt. In the ascertainment of the value of a vessel, in case of a total loss, the rule of market value must be adopted, if there is a market for such vessel and the market value thereof be made to appear, unless the vessel falls within the exception which we have noted.

2. But it is contended by the appellee that the rule of market value cannot be applied to the case now before this court for the reason that the Telegraph was in a class by herself by reason of the fact that she was possessed of extraordinary speed; and for the further reason that the evidence showed that there was no market for a vessel of her type of construction. Their claim is that the only fair method by which the value of the Telegraph could have been ascertained was by testimony showing the original cost of construction, less a proper allowance for depreciation. And in support of this claim they proceeded to introduce testimony showing the original cost of construction of the Telegraph and the percentage of depreciation of the various parts of their steamship during the nine years she had been in operation.

It appears from the record that the Telegraph was a passenger steamer of the stern wheel type, having a length of about 153 feet, a width of about 27 feet, and a depth of 8 feet; that she was built at Everett, Wash., in 1903, at a cost of about $75,000. After a careful consideration of all of the testimony introduced by the respective parties, we are not prepared to agree with the appellee that the testimony showed that the Telegraph was in a class by herself by reason of the fact that she was possessed of extraordinary speed. It is true, one of appellee's witnesses testified that the Telegraph was "the fastest sternwheeler in the word"; but the record is replete with testimony tending to show that such was not the case. Barney Dionne, a witness on behalf of the appellant, testified that he was chief engineer of the Telegraph for about 3½ years; that he had got out of the Telegraph all of the speed she ever made, and the best she could make was between 18 and 19 statute miles per hour; that the Telegraph was not the fastest stern-wheel vessel ever constructed; that he knew that the Telephone and the Bailey Gatzert (both stern-wheel steamships operating on and in the vicinity of Puget Sound) could run faster than the Telegraph under the same conditions; that he had seen the Telephone catch up with the Telegraph when he was driving the latter at her best, showing

the Telephone to be faster; that he had been chief engineer of the Bailey Gatzert for five years, running on the Willamette and Columbia rivers; that he had run the latter vessel over the same course as he had run the Telegraph and had beaten the best time the Telegraph could or did make. Capt. Arthur Riggs, a witness for the appellant, testified that he was master mariner of the steamer Telegraph in 1905 and 1907; that he had operated the Telegraph at her full speed; that the maximum speed of the Telegraph under ordinary conditions was between 18 and 19 miles an hour; that he did not think it was correct that the Telegraph was the fastest stern-wheel vessel ever constructed; that he thought the Telephone was capable of making greater speed; that he judged·this from her performance on the river while she was at Portland; and that he had seen her operate along with the Telegraph many times. Other witnesses on behalf of the appellant, whose testimony of this point we do not deem it necessary to review, testified substantially to the same facts, and we think there can be no doubt but that there was nothing in the speed of the Telegraph calculated to place her value above the value of other steamships of similar type of construction.

Nor can we agree with the appellee that it appears from the record that there was no market for a steamer of the type of construction of the Telegraph, and that such market not being shown, and a market value for her made to appear, the rule of market value could not be applied as a fair method of computing her value at the time she was sunk; and therefore her value could only be proven by other circumstances, such as cost of construction, less a proper allowance for depreciation. In this connection it must be remembered that the Telegraph was one of a numerous class of stern-wheel steamers which are operated for the carriage of freight and passengers upon and in the vicinity of Puget Sound, the Willamette river, and the Columbia river, and between Portland and Astoria; and that steamers of a similiar type of construction are also operated on the Bay of San Francisco and upon the rivers tributary thereto. The construction of the Telegraph was in no respect an innovation in the art of shipbuilding. It appears from the record that the Telegraph could have been used on any of the routes and at any of the places above named. It also appears that stern-wheel vessels of the general type of construction of the Telegraph were frequently bought and sold for use on Puget Sound and other places along the coast where vessels of the stern-wheel type could be utilized. Capt. Gibbs, agent and surveyor for the San Francisco Board of Marine Underwriters, testified that there were several routes on which a vessel like the Telegraph could have been operated; that he had known of several sales of stern-wheel vessels similar to the Telegraph; that the Telephone was sold in Portland, Or., for use on San Francisco Bay, for $24,800; that the steamer Charles R. Spencer, a vessel similar to the Telegraph, was sold for $20,000; that it would appear that there must be a market for this kind of vessel; and that in his opinion the fair reasonable market value of the Telegraph before she was sunk was about $25,000. George N. Skinner, a witness on behalf of the appellant who had been

engaged in the lumber and transportation business in Seattle, Wash., for about seven years, testified that the Telegraph could have been used on the Columbia river and on the Willamette river, on Puget Sound, or on San Francisco Bay; that the Telegraph had been in service all the time she had been on the Sound; that .he himself had tried to buy her after the collision with the Alameda and after she had been raised; that she had been offered to him, rebuilt and in as good condition as it was possible to put her, for $19,000. Capt. T. W. Spencer testified that he had sold his steamer the Spencer, in 1911, at a voluntary sale, for $25,000; that the Spencer was at that time nine years old and a larger boat than the Telegraph; and that he considered the Spencer at the time of her sale to be the "speediest" boat on the river. C. W. Cook, Pacific Coast manager of the American-Hawaiian Steamship Company, testified that the Telegraph could have been used in the passenger business on the Columbia river and perhaps at San Francisco; that he considered the reasonable market value of the Telegraph about $20,000. Joseph Supple, owner of a shipyard at Portland, Or., testified that there was at the time and place the Telegraph was sunk a market for stern-wheel vessels of normal practical type that could be used for towboats or freight boats or passenger boats, or all combined; that there was then a ready sale at fair prices for such boats; that the Telegraph was a peculiar type of boat, built only for passengers, and not fit for towing or carrying freight; that the demand for her would be best for a strictly passenger run; that a .large number of stern-wheel vessels had been bought and sold at Portland, where there was always a market for such vessels; and that stern-wheel vessels were being bought and sold all the time, and new ones are being constructed on the coast. Marcus Talbott, general manager for the Port of Portland Commission, testified that he had bought and sold stern-wheel vessels at Seattle and at other places where the Telegraph could have been taken and used; that at the time the Telegraph was sunk there was a market at Seattle for the Telegraph and vessels of her kind and type; and that the fair, reasonable market value of the Telegraph at the time and place she was sunk would not exceed $25,000; that, while the market at Seattle was not an active one, still in his judgment there would have been competitive bids; that he knew of various sales of stern-wheel vessels; that the State of Washington had sold for $17,000; that the Capitol City had sold for $17,000; that the Telephone had sold for $24,500; that the sales of these vessels were not forced; and that each of these vessels was much larger than the Telegraph and carried more passengers and a larger amount of freight.

The testimony of these witnesses was, we think, sufficient to establish the fact that there was a market for the Telegraph and that her value in such market would not have exceeded $25,000. But the testimony finds further support in the fact that in 1910 the appellee purchased the Telegraph and the City of Everitt (another stern-wheel steamer of the same general type of the Telegraph, but smaller), together with the good will of the route upon which said steamers were being operated at that time, for the sum of $55,000. And in connec-

tion with this transaction it appears from the testimony of Capt. Scott, who owned both of said boats and said route at the time of their purchase by the appellee, that the Telegraph had been built in 1903 and the City of Everitt about 1900; that at the time of their sale to the appellee in 1910 they were both sound, good boats, and had depreciated in value but very little. It also appears from the undisputed testimony of Capt. Joshua Green, president of the appellee corporation, that the Telegraph was not insured at the time she was sunk, but that prior to that time the Telegraph and the City of Everitt had each been insured in the sum of $27,500.

In view of this testimony, we think the court below erred in basing the value of the Telegraph at the time she was sunk on the theory of original cost, less a percentage for depreciation. We are of opinion that the evidence was sufficient to justify the court below in finding that there was a market for a vessel of the character of the Telegraph in Puget Sound, at the time of the accident, and that her value in such market at that time was $25,000.

The decree of the court below will, accordingly, be reversed, with directions to enter a decree in favor of the appellee for the sum of $25,000. Costs in this court in favor of the appellant.