## THE I. C. WHITE. THE BLANCHE C. PENDLETON. PAN-AMERICAN PETROLEUM & TRANSPORT CO. v. KENNEALLY.

(Circuit Court of Appeals, Fourth Circuit. February 5, 1924.)

No. 2158.

1. **Admiralty ⬅118—Finding of commissioner to ascertain damages stands, unless substantially erroneous.**

The findings of the commissioner appointed to ascertain damages must stand, unless there is substantial error therein.

2. **Collision ⬅133—Measure of damages for loss of vessel.**

The owner of a vessel sunk in collision, due to the fault of another, is entitled to restitution, which is measured by the market value of the ship, if that can be shown.

3. **Collision ⬅133—Measure of damages for loss of vessel peculiarly adapted to owner's use.**

Where a vessel sunk in collision through fault of another is of such peculiar construction that there is no market for her, the owner would be entitled to the cost of replacement less depreciation, if evidence showed that it was earning for him a fair return on such value, or, if otherwise, an amount which would make good to him the diminution of his earnings resulting from his loss.

4. **Collision ⬅133—Market value rule applied to ship of unusually substantial construction.**

Where a schooner intended to be used in shallow harbors, in addition to being constructed with the comparatively flat bottom usual in vessels intended to trade in such places, was built of unusually heavy timbers, strongly reinforced throughout by bridgework, etc., the owner was not entitled to cost of construction less depreciation, but only to the market value plus an adequate allowance for her superior value, though there had been a sharp decline in the value of ships, and owner could not find the same kind on the market.

5. **Collision ⬅133—Low price level of ships held not so temporary as to be legally irrelevant in determining market value.**

Where, at the time of the loss of a vessel through collision, there had been a sharp decline in value of ships, due to falling off of demand after the war, which continued for nearly three years thereafter, it was error to dismiss such price level as so temporary as to be legally irrelevant.

6. **Collision ⬅133—Where market exists to determine value of ship lost stated.**

Where, at the time of the loss of a vessel through collision, there are enough ships for sale to enable owner to buy another, there is a market, and if what is desired is to provide him with the means of giving him what he has lost, that is done by awarding him the price for which he can buy a ship.

7. **Collision ⬅128, 133—Owner of vessel lost held properly allowed for loss of freights, stores, etc.**

The owner of a vessel lost in a collision through fault of another was properly allowed damages for loss of freights, stores, etc.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Libel by J. F. Kenneally, master of the schooner Blanche C. Pendleton, against the Pan-American Petroleum & Transport Company, as owner and claimant of the steamship I. C. White. Decree for libelant, and respondent appeals. Affirmed, as modified.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

295 F.—38

A. Howard Neely, of New York City, and H. H. Little, of Norfolk, Va. (Burlingham, Veeder, Masten & Fearey, of New York City, Hughes, Little & Seawell, of Norfolk, Va., and Chauncey I. Clark, of New York City, on the brief), for appellant.

Braden Vandeventer, of Norfolk, Va. (Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellee.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. In a collision occasioned solely by the fault of the steamship I. C. White, the schooner Blanche C. Pendleton was totally lost. The only question here in controversy is how much her owner is entitled to recover. She was a four-masted schooner, 183.2 feet long, 36.11 feet broad, and 17.5 feet deep. Her gross tonnage was 880; her net, 805. She had a dead weight carrying capacity of from 1,350 to 1,400 tons. She was built at Belfast, Me, and first put in commission in June, 1920. At the time she was under construction, shipbuilding prices were at or about their peak, and she cost $155,000. She was about 19 months old when she went down, and previous to the collision had been in first-class condition.

To what is her owner entitled? Both sides agree that he should get whatever is required to make good his loss. They differ as to the method of determining what that is. Her owner says that, subject to a small deduction for her depreciation during her short life, he should be paid what, at the time she was sunk, it would have cost to replace her. The respondent's view is different. It asserts that between June, 1920, and January, 1922, ships to a greater extent, perhaps, than anything else, had experienced that decline in value which during that period affected so many commodities. It claims that at the time the schooner was sunk, she would have brought in the market less than 25 per cent. of what she cost to build, and that this sum of somewhere between $30,000 and $35,000 is the maximum it can be called upon to pay. Her owner admits that the general rule is that the measure of damages in a case of total loss is the market value of the ship at the time the wrong was done, but it says that this method of arriving at its damage cannot be here applied for two reasons: First, that when she went down, and for an appreciable time before and after, there was no market for ships, and consequently there is no way of finding out what her market value was: second, that, even if buying and selling of ordinary ships had been actively going on, the prices they brought would have thrown no light upon her value, because it insists that she was of such peculiar construction that she was in a class to herself. Her owner claims he had need of precisely such a craft. Her place could not be supplied by any one of the usual types of ships, and it therefore may rightfully insist on receiving such a sum as would have paid the cost of building another like her, giving credit, however, for the gain it would have made by getting a brand new schooner in place of one 19 months old.

[1, 2] These contentions of the owner were accepted by the commissioner charged with the ascertainment of the damage done. He saw and heard many witnesses. He prepared and submitted an elaborate,

careful, and learned report, which the District Court confirmed after hearing all the respondent could urge against it. The presumption in favor of his findings is strong. They must stand, unless we are convinced that there is substantial error in them. In awarding damages, the aim is to put the injured party back in the pecuniary position he occupied before the wrong was done. If property has been taken away from him, he should have it or its equivalent restored to him, if that be possible. If things of the kind he has lost are being freely traded in, so that he can go into the open market and buy them, the fair measure of what he should receive is the sum which would purchase articles of the character, quantity, and quality of those taken from him. It is ordinarily so much easier to apply this method of measuring damage, and it is so much less likely to do injustice, that the law insists that it shall be used whenever possible. It governs, not only in the case of standardized commodities, but in such things as ships, in which, perhaps, no two were ever precisely alike, although there are numerous types, the differences between the individual specimens of which are relatively unimportant Dr. Lushington said many years ago:

"It is the market price which the court looks to, and nothing else, as the value of the property;" i. e., ship. 'It is an old saying that the worth of the thing is the price it will bring.'" The Clyde, Swaby, 23.

The law is still the same as it was in his day. It is unnecessary here to repeat the full and critical examination of the decided cases and the opinions of the text-writers, made a decade ago, by the Circuit Court of Appeals for the Ninth Circuit (Alaska Steamship Co. v. Inland Navigation Co., 211 Fed. 840, 128 C. C. A. 366), and which has recently been brought down practically to date by the Circuit Court of Appeals for the Second Circuit in The Cushing, 292 Fed. 560.

[3] The market value yardstick cannot be applied to a ship of so peculiar construction that, while it profitably serves some need of its owner, nobody else has occasion for it. If it were offered for sale, it would very probably bring little more than its junk value. In such case, its owner would be entitled to the cost of its replacement less depreciation, if the evidence showed that it was earning for him a fair return on such value, or, if the fact were otherwise, to an amount which would make good to him the diminution of his earnings resulting from his loss of it.

[4] We are not persuaded the commissioner was right in concluding that the construction of this schooner or the use to which she was put was so out of the ordinary as to make altogether irrelevant evidence of the market value of other craft of the same general class employed in the same trade. In many ports which schooners have occasion to visit the water is relatively shallow. Deep-draught ships cannot enter them, and yet, other things being equal, there is economy in using vessels of large carrying capacity. For some time, therefore, schooners intended to trade at such places have been built with comparatively flat bottoms, as was the Pendleton. Vessels so constructed are liable to certain strains, to which others of more ordinary build are less subject. In order to guard against this source of weakness, the schooner

with which we are concerned had been built of unusually heavy timbers. She had a strongly reinforced keelson. She had a fore and aft center line of truss or bridge work, consisting of a stringer reaching from stem to stern post, immediately under and supporting the deck beams, and supported in turn by vertical stanchions diagonally braced and resting on the keelson; the whole forming a system of bridge work from deck down to keelson and extending throughout the length of the ship. She was also supplied with heavy internal reinforcement at the turn of the bilge.

All of these things made her a stronger vessel, and one perhaps better adapted to the successful prosecution of the trade in which she and countless others less substantially built were engaged. She was not put to any peculiar use. If she had been offered for sale under ordinary conditions, there would have been a market for her. If the features in which she differed from other schooners of her size were of real value to her, in the judgment of those engaged in the trade, that extra worth would doubtless have been reflected in the price she would bring. The owner of the lost vessel could not, it is true, in the market find another precisely like it; but he would be able to get one of a kind which other people had been able profitably to use in the same trade. In such event, we think he would be entitled to such sum as such other ship would cost in the market, plus an adequate allowance for the superior worth of his ship which was destroyed, as shown in her unusual capacity to earn a net income and the probability of her longer life, if such factors can be determined with reasonable approach to accuracy.

[5] In the present case, the owner, for the purpose of recovering the freight for the pending voyage, proved what she would have earned on it; but no attempt was made to show what her annual net income was, and how it compared with that of other schooners not having her special construction. It would have been very easy for the owner to have furnished this information, if it had thought it advantageous to do so, for it owns and operates a fleet of a score or more vessels, not all of which have the peculiarities of the one which was sunk. The learned commissioner held that in January, 1922, there was no such market as would afford a reasonably fair basis to estimate the market value of a vessel of the ordinary type. He finds that when, in the summer of 1920, the lull in shipping came, the market broke, and an almost vertical drop in prices resulted, that during all the year 1921 the depreciation continued, but in January, 1922, there was a slight tendency to recovery. The record shows that in substance the conditions prevailing at the beginning of the year 1922 continued for a number of months thereafter, and there is nothing to indicate that up to the date of the filing of the commissioner's report, 17 months after the collision, there had been any marked change in the selling prices of ships. A state of things which lasted for three years or more may not be dismissed as so temporary as to be legally irrelevant.

[6] During the period covered by the detailed evidence a number of schooners of approximately the size of the Pendleton were sold. Some of them were vessels which were not so new or so well conditioned. A number of the sales were made under legal or financial com-

pulsion. Some one or another special circumstance might be validly set up against assuming that the price paid for any one of these ships was conclusive or even persuasive evidence of market value, but there were enough of them, and the ages, their states of repair, and the circumstances under which they were sold differed among themselves sufficiently to make the consistent story they tell a demonstration that since June 1920, there had been a really startling fall in the market value of ships. It is doubtless true that during that time financially strong shipowners did not put their ships on the market. They held them hoping for better things, precisely as during the same period men who had sugar, cotton, wheat, or other goods kept them if they could, but there were enough who were forced to sell these other commodities to fix the market price for them. If there were enough ships, or sufficient of any other commodity offered for sale, to enable one who is in need of such an article to get it, there is a market, so far as he is concerned, and if what is desired is to provide him with the means of getting what he has lost, that is done when he is awarded the price for which he can buy the like.

We think the learned commissioner erred in giving no weight whatever to the evidence showing what prices were paid at the fairly numerous sales which were proved. The Pendleton was almost new. She was built perhaps on a better plan, certainly of superior material to those used in construction of most of the vessels which were sold. For these reasons, it would be unfair to hold that her value should be fixed alone by the prices realized from the sale of those less valuable ships; but it would be at least as serious an error to ignore the fact that the prices which were paid demonstrated that the market value of ships had declined far more rapidly and to a much greater extent than had the cost of building them. This fact, of course, was the natural result of the abnormally large construction of ships during the wartime and the sharp decline in the demand for shipping since 1920. In measuring the value of the Pendleton at the time of the collision by the replacement cost, less depreciation, and by that alone, we think the learned commissioner made not only a theoretical but a practical error, and thereby placed an unfair burden upon the respondent. The cost of replacement is a factor to be used in checking up the other testimony; but it should not have been given the principal weight, much less should it have been treated as controlling.

[7] In reaching our own conclusion, we have sought to keep all the evidence in mind. Those portions of it which tend to show the Pendleton, at the time she was sunk, was worth much less than what it would have cost to build another schooner like her, have already been summarized. On the other hand, we have not lost sight of the fact that at the time she was sunk she was nearly new, that her construction was above the average of other vessels in the same trade, that the still high shipyard costs had some tendency to sustain the market price of vessels, that the net impression produced upon the able and experienced commissioner by the testimony was favorable to the owner's claim, and that doubtful questions are to be resolved against a wrongdoer. Nevertheless we are persuaded that the sum of $66,000 at least

equals, if it does not exceed, the market value of the Pendleton at the time of the collision. This is approximately one-third less than the amount allowed by the commissioner in the court below, but it is double the highest price which during the period covered by the testimony was paid for any vessel of her size and general character. The owner was rightfully allowed below the additional sum of $4,477.54 for the loss of freights, stores, etc.

It follows that so much of the decree of the District Court in favor of the libelant as awarded to him $103,000.41 on behalf of Pendleton Bros., Inc., as owner of the sunken schooner, her stores, freight, etc., must be reduced to $70,477.54, and that it is affirmed, as so modified.