## THE ATLANTIC CITY.

(Circuit Court of Appeals, Third Circuit. January 24, 1906.)

No. 50.

1. COLLISION—STEAM VESSELS MEETING—APPLICATION OF RULES.

Rule 3 of the supervising inspectors in force in 1896, providing that "if, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other," he shall signify the same by signals, and, if within half a mile of each other, the vessels shall slow down until an agreement is made and understood. does not apply to steamers meeting on the Delaware river where it is 2,000 feet wide, on such courses that, if they are maintained, the vessels will pass in safety, and under such circumstances one of the vessels is not in fault for keeping her course and speed without signaling.

[Ed. Note.—Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

2. SAME—CHANGE OF COURSE—MISTAKING SIGNALS.

A steam vessel, meeting another on courses which, if maintained, would have taken them past each other starboard to starboard without

danger of collision, *held* solely in fault for a collision between them brought about by her mistaking a signal from another vessel for one from the meeting steamer and suddenly porting her helm when they were not more than 300 feet apart; the other vessel having kept her course until such maneuver, when she at once stopped and reversed.

Appeal from the District Court, of the United States for the District of New Jersey.

For opinion below, see 136 Fed. 996.

John F. Lewis, for appellant.

Samuel Park, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. A libel was filed in this case, in the district court, by the owner of the river steamboat "Sylvan Glen," against the steam ferryboat "Atlantic City," to recover damages for a collision which occurred August 18, 1896, at about 11 o'clock at night, between the "Sylvan Glen," which was bound up the Delaware river, and the ferryboat "Atlantic City," which was bound down, somewhere about mid-channel, opposite the city of Philadelphia. The libel charges that, when the steamboat "Sylvan Glen," which was bound from Washington Park, in New Jersey, to Arch Street Wharf, Philadelphia, had reached about opposite South street, the steam ferryboat "Atlantic City," running between Chestnut Street Wharf, Philadelphia, and Kaighn's Point, Camden, was sighted by those in charge of the "Sylvan Glen"; that the "Atlantic City" was then about opposite Walnut street, and was showing her green light to the "Sylvan Glen"; that those in charge of the "Sylvan Glen" gave a signal of two whistles to the "Atlantic City"; that the "Atlantic City" did not reply at once, but shortly after, gave a signal of one whistle to the "Sylvan Glen," and changed her course to starboard; that thereupon the "Sylvan Glen" ported her helm, in order to pass port to port; that at this time the "Sylvan Glen" was about half a square below the new Boston Steamship Wharf, and the "Atlantic City" was about the same distance above; that the "Atlantic City," at this time, was showing her red and green lights, but immediately the course of the "Atlantic City" was changed to port, heading almost directly to the "Sylvan Glen," the "Atlantic City" blowing danger signals; that the engines of the "Sylvan Glen" were stopped and reversed, but that the "Atlantic City" kept on, striking the "Sylvan Glen" on the port side, at the forward gangway, producing serious damage to the "Sylvan Glen." The libel charges that the said collision was occasioned through no fault or negligence on the part of the "Sylvan Glen," but was wholly caused by the negligence and carelessness of those in charge of the navigation of the "Atlantic City," in that: (1) Upon receiving the signal of two whistles from the "Sylvan Glen," the two vessels at that time being upon courses which did not involve risk or collision, she gave a cross signal of one whistle, and ported her helm, thereby changing her course to starboard, nearer the course of the "Sylvan Glen"; (2) that, after giving said signal of one whistle, and porting her helm, she did not keep under said port helm, but instead thereof, starboarded

her helm and changed her course to port, bringing her in contact with libelant's boat, "Sylvan Glen"; (3) that the "Atlantic City" did not stop and back, when those in charge thereof saw that a collision was probable, and that she did not keep and maintain a good and efficient lookout.

The case is fully stated in the findings of fact made by the learned judge of the district court, in his opinion. These findings are not only accepted as judicial findings of fact are required to be, but, after a careful reading of the testimony, we are in entire agreement with them. This portion of the opinion is as follows:

"I think, however, the weight of the testimony establishes the following facts: The 'Sylvan Glen' left Washington Park, below Philadelphia, about ten and a half o'clock in the evening, bound for the Arch Street Wharf, Philadelphia. She passed up the river, somewhat on the Philadelphia side of the middle of the river. When about opposite the South Street Wharf her pilot sighted the 'Atlantic City' coming out from her wharf at Chestnut street and turning down the river. After straightening out her course, the 'Atlantic City' was about in the middle of the river. Each of the vessels showed to the other her green or starboard light. When they were not over half mile apart, and while each was showing to the other her green light, each of them gave to the other a signal of two whistles, thus indicating the intention of their respective pilots to pass starboard to starboard. Neither of the pilots heard the signal of the other. Notwithstanding this fact, both of the vessels were continued at full speed without the repetition of any signal, and, on the apparent assumption that each vessel would continue to show her green light to the other, and that they would pass each other on their starboard sides. After they had reached a position of probably not more than 300 feet apart, the 'Glen,' as all her witnesses admit, suddenly ported her wheel and sheered across the 'Atlantic City's' bow. Almost instantly it became evident that there was danger of collision, and the engines of both vessels were stopped and reversed, but too late to prevent a collision. The 'Atlantic City' struck the 'Glen' near her port bow. Had the two vessels continued their original courses, they would have passed starboard to starboard without danger of collision. The pilot of the 'Glen' says that the 'Atlantic City,' after first showing her green light to the 'Glen,' gave a signal of one blast, starboarded her course, and then after the 'Glen' had starboarded her course, the 'Atlantic City' ported her course and 'chased' the 'Glen' about the river, and thus caused the collision. The weight of evidence satisfies me that the 'Atlantic City' continued her course with a steady wheel, and that the pilot of the 'Glen' is mistaken in his statement that the 'Atlantic City' in anywise altered her course. The pilot of the 'Glen' further says that he ported his wheel and attempted to pass on the port side of the 'Atlantic City,' because of a signal of one blast given to him by the 'Atlantic City.' In this statement the pilot of the 'Glen' is also clearly mistaken. It appears that a steam tug with a car float in tow was crossing the river from Camden to Philadelphia ahead of the 'Glen.' The pilot of the tug says that as he was crossing the river the 'Atlantic City' crossed his bow, and just as the 'Atlantic City' was so doing the 'Glen' gave a blast of one whistle, which he, the pilot of the tug, understood to be for him, and that he responded to it with one blast. By these signals, the pilot of the tug understood that the 'Glen' would pass to the stern of the tug. The pilot of the 'Atlantic City' and other witnesses declare that the 'Atlantic City' gave no signal of one blast, and it is quite clear to me that the pilot of the 'Glen' mistook the signal of the tug for the signal of the 'Atlantic City.' The collision occurred a little to the Camden side of the middle of the river, at a point where the river is about 2,000 feet in width."

The situation disclosed by these findings of fact, is, then, simply, that the "Sylvan Glen" was proceeding up the river a little to the westward of the middle of the channel, which was about 2,000 feet wide, when she sighted the "Atlantic City" coming out of her wharf at Chestnut street, and turning down the river; that when she had so turned on her course down, the steamers were about half a mile apart, each showing to the other her green or starboard light. Each of them gave to the other a signal of two whistles, indicating the intention of their two pilots to pass starboard to starboard. The course of the "Atlantic City" was about in the middle of the river, or as seems probable from the testimony, after the signals were given, a little to the eastward thereof. That after the blowing of the whistles, both vessels continued at full speed, on the apparent assumption that each understood the other's signals, and that they would pass each other on their starboard sides. As they passed over the half mile that separated them when the signals were blown, it is manifest that the course of each was to the starboard of and parallel with the course of the other, and that these courses were sufficiently separated, and insured a safe passing. That their courses continued on these parallel lines, until the "Sylvan Glen," when not more than 300 feet away, ported her helm and sheered across the "Atlantic's" bow. The danger of collision being at once evident, the engines of both vessels were stopped and reversed, but too late to prevent a collision. The learned judge finds, as a fact deduced from the testimony, that "had the two vessels continued their original course, they would have passed starboard to starboard, without danger of collision."

The situation thus described, was such as to justify either vessel, although not hearing the signal of the other, in assuming that its own signal was heard, because both were acting in conformity to the signals given by pursuing their parallel courses up and down the river. There was nothing for either to do but to proceed on the course she was on, continuing to show green light to green light. The margin of safety was as great as was necessary. As the distance between them was lessened, each vessel had a right to suppose that the other was cognizant of, and appreciated, the situation and the conduct necessary to safety, which was that each should keep on its course, and thus pass starboard to starboard. No signaling was necessary to inform either vessel what such a situation required. It is a fact, however, as found by the learned judge of the district court, that, when not more than 300 feet away, the "Sylvan Glen" suddenly ported her helm and sheered across the bow of the "Atlantic City"; that the "Atlantic City" had not changed her course, but was continuing the same with a steady wheel, and immediately, upon the sheering of the "Sylvan Glen," stopped, and then reversed her engines at full speed. Stopping here, it is difficult to see upon what ground fault can be attributed to the "Atlantic City." She had a right to proceed upon her course at full speed down the river, with the "Sylvan Glen" within view but upon such a course parallel to her own as would insure safety, if adhered to. Vessels are not required, in navigating broad river channels, to go at slow

speed, to avoid collision with another vessel, which collision could only occur by a reckless disregard of the rules of navigation, as well as of the dictates of common sense. The situation just prior to the sheering of the "Sylvan Glen," in this case, was such that the course of safety was obvious to both parties, and nothing was due, or necessary, in the way of signaling from one to the other. No signal was required from one vessel, to inform the other that they were to pass to starboard, as they approached within the half mile on these parallel courses. Nothing but gross negligence on the part of one or both, could have brought them together.

This brings us to consider the ground upon which the learned judge held both vessels at fault. He cites rule 3 of the board of supervising inspectors, in force at the date of the collision, as follows:

"If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

The learned judge then says:

"The proper observation of this rule would have prevented any collision. Neither pilot was properly discharging his duty when he continued on his course with unabated speed, after having given his signal of two blasts, without having received any response from the other vessel, and without having ascertained the intention of the other vessel."

We cannot agree with the learned judge, in thinking that this rule is controlling or applicable in the present case. It manifestly refers to vessels so approaching each other, as that it is not obvious whether they will pass to starboard or port. It applies to vessels in a narrow channel, or to vessels approaching head on, or nearly so, where "either vessel fails to understand the course or intention of the other." This was obviously not the situation in the case at bar. The testimony shows, and the court in its findings of fact, has found, that after the signals were given, when half a mile apart, each vessel understood the intention of the other, for the learned judge says that they continued, without repetition of signal, on the apparent assumption that each would show her green light to the other and that they would pass each other on their starboard sides. The learned judge has also found that, had the two vessels continued their original courses, they would have passed starboard to starboard, without danger of collision. There was no reason why in this case, the pilot of either vessel, as the rule states, should be in doubt as to the course or intention of the other, and the testimony shows, as a matter of fact, that no confusion or doubt, or cause for the same, existed until the "Sylvan Glen" suddenly sheered across the bow of the "Atlantic City," when only 300 feet away; the captain of the "Sylvan Glen," in substance and effect, testifying that he had no other idea than that they would pass starboard to starboard, until he heard the one whistle of the tug, as the "Atlantic City" passed across its bow, which he mistakenly took

for a signal from the "Atlantic City," that she intended to sheer to port. We do not think that, by any just interpretation of the meaning of rule 3, the "Atlantic City" came within its operation.

The "Sylvan Glen" must therefore be held wholly in fault. The fact, as found by the learned judge of the court below, that the one whistle given by the tug crossing from Camden to Philadelphia, as the "Atlantic City" crossed its bow, was mistaken by the "Sylvan Glen" for a signal whistle from the "Atlantic City," while it explains the otherwise incomprehensible conduct of the "Sylvan Glen," cannot, of course, put the "Atlantic City" in fault, and no contention is made that it does. The fact is here referred to, only to relieve the "Sylvan Glen" from a charge of wanton recklessness in sheering across the bow of the "Atlantic City."

The judgment of the court below must be reversed, with instructions to enter a decree dismissing the libel.