THE CUSHING.  THE PROTEUS.  Petition of STANDARD OIL CO. OF
NEW JERSEY.*

(Circuit Court of Appeals, Second Circuit.  July 16, 1923.)

No. 258.

1. Collision ⬅⟹40—Two steamships meeting at sea at night both held in fault.

A collision at sea on a moonlight night during war time between the steamships Proteus and Cushing, both without lights, and approaching on nearly opposite courses, *held* due to faults of both ships; the Proteus, which did not see the Cushing until when less than a mile away, being in fault for immediately hard-aporting and proceeding at full speed, without signaling her change· of course or showing her lights, and the Cushing, which saw the Proteus when five miles away, for proceeding at full speed without showing her lights, changing her course, or giving any signal until the ships' were less than half a mile apart.

2. Collision ⬅⟹133—Measure of damages for loss of vessel.

The owner of a vessel sunk in collision through the fault of another is entitled to restitution, which is measured by the market value of the ship, if that can be shown, immediately before the collision.

3. Collision ⬅⟹133—Measure of damages for loss of vessel in collision is her then market value.

That a vessel, when sunk in collision in war time, was under requisition to the government, does not affect the fact that the monetary loss, which was that of the owner, was her then market value, and, if that value was enhanced by reason of war conditions, he is entitled to such enhanced· value, since nothing less would be restitution.

4. Collision ⬅⟹133—Measure of damages for loss of vessel.

Where, at the time of the loss of a vessel through collision, there was no market valuᵒ. because war conditions prevented there being vessels in the market, the measure of damages for the loss is the cost of reproduction, less depreciation.

5. Collision ⬅⟹133—War prices to be considered in fixing cost of reproduction of ship lost in collision.

Enhanced prices of shipbuilding, due to war conditions, while unusual, were not artificial or fictitious, but actual, and must be considered in computing the cost of reproduction of ·a ship lost in collision· during that time.

Appeals from the District Court of the United States for the Southern District of New York.

Petition of the Standard Oil Company of New Jersey, as owner of the Steamship Cushing, for limitation of liability for collision with the steamship Proteus; the Southern Pacific Company, owner of the Proteus, claimant. From the decree, both parties appeal.  Modified.

For opinion below, see 285 Fed. 617.  See, also, 266 Fed. 570; 284 Fed. 526.

A libel was filed by the Southern Pacific Railroad Company against the steamship Cushing.  Limitation of liability proceedings were instituted by the Standard Oil Company of New Jersey, as owner of the steamship Cushing, and by the Southern Pacific Company, as owner of the steamship Proteus, in which the Director General of Railroads joined as a petitioner.  The proceedings were consolidated.  A decree was entered, assessing damages against both vessels for loss of the Proteus and her cargo.  Both petitioners appeal.

⬅⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 44 Sup. Ct. 133, 68 L. Ed. ——.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles C. Burlingham, Chauncey I. Clark, A. Howard Neely, and Ralph W. Brown, all of New York City, of counsel), for appellant Southern Pac. Co.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (J. Parker Kirlin and W. H. McGrann, both of New York City, of counsel), for appellant Standard Oil Co. of New Jersey.

Bigham, Englar & Jones, of New York City (D. Roger Englar, T. Catesby Jones, and James W. Ryan, all of New York City, of counsel), for certain appellees.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. On September 11, 1918, the Southern Pacific Company, as owner of the steamship Proteus, filed its libel against the Cushing. Several actions were begun in the New York Supreme Court against the steamship Proteus and the Standard Oil Company of New Jersey for personal injury and property loss. On March 14, 1919, the Standard Oil Company of New Jersey filed its petition for limitation of liability. On January 21, 1921, the Southern Pacific Company, as owner of the Proteus, and Walter H. Hines, as Director General of Railroads, filed a petition for limitation of liability. After a trial, the court below held both the Cushing and the Proteus at fault, and referred the matter of damages to a commissioner, who, after taking proofs, fixed the value of the steamship Proteus at $750,000. A very large number of the Proteus cargo owners have been awarded damages for their losses. This appeal presents no question as to the amounts awarded cargo owners. The question argued is the liability of the respective steamships and the amount fixed as the value of the steamship Proteus.

[1] The Proteus was bound from New Orleans to New York, and the Cushing was on a voyage from New York to Beaumont, Tex., in ballast. On passing the Lookout Shoal Lightship at about 9:45 p. m. on August 18, 1918, the Proteus set her course for Diamond Shoals Gas Buoy N. 50° E. true. It was a clear night, with the moon shining, but at times obscured by the clouds. Both vessels were running without lights. the Proteus at full speed of 13½ knots. The Cushing in the early morning of August 19th was steering her course S. 40° W. true, at full speed, making 12½ knots. The second officer of the Cushing was on the bridge in charge and alone. There was a lookout in the crow's nest, and another forward on the forecastle head. The vessels were on practically opposite courses; the Proteus about N. E. and the Cushing about S. W., the courses lacking about three degrees of being parallel. The starboard bow of the Cushing was camouflaged to make her appear to be on a course three points to starboard of her real course. The moon was two days short of being full, and was shining over the Proteus' port quarter and on the Cushing's starboard bow.

About 15 minutes before the collision, and at about 12:50 (the Cushing's time). the Cushing observed a ship without lights, which proved

292 F.—36

to be the Proteus, on the Cushing's starboard bow, about 5 miles distant. The Cushing continued at full speed, without changing her course or switching on her lights. The Proteus did not see the Cushing, which was camouflaged, until three-quarters of a mile or a mile off. She appeared to be about dead ahead, or a little on the port bow, and the Proteus immediately hard-aported her helm. The Porteus kept on at full speed, with her helm hard aport, until the collision, which was about 2½ to 3 minutes later. The Cushing's second officer, watching the Proteus, discovered the alteration immediately after it started three-quarters of a mile away, or about 3 minutes before the collision. He says the Proteus was then bearing 3½ points on the starboard bow. Some time afterward, about a minute and a half, he ported and switched on the Cushing's lights, and later he hard-aported, and just before the collision reversed her engines. The Cushing swung 2½ points to starboard just before the collision. Her change of course, as the Cushing's steering compass read, was S. 75° W. at the time of the collision, 25° change from her compass of S. 50° W., or from S. 47° W. true to S. 72° W. true. Thus, at the time of the collision, the angle of the collision was about 70° as fixed by the second officer of the Cushing, and the Proteus was headed at the time of the collision E. 52° S. true, and the latter swung under her hard aport helm 92° or eight points. The time of the collision was 1:05 a. m. All agreed it was a moonlight night and the weather fine and clear, with passing clouds.

Each vessel was proceeding without lights under orders of the government. The Proteus apparently swung eight points to starboard before the collision, and in making the turn her bow went about 1,300 feet and at the same time made good between 1,100 and 1,200 feet to starboard of her original course. This maneuver was executed in two minutes. This calculation is arrived at by applying the distance actually traveled by her bow (2,000 feet) and the speed of the ship in making the turn (10 knots an hour) or 75 per cent. of the initial speed. During the early part of these 2 minutes, the Cushing, as found below, was going ahead full speed at 12½ knots, a distance of 1,600 or 1,700 feet. After reversing full speed, her bow continued to advance about 850 feet. She made good about 150 feet to starboard of the original course. The calculation as to the Cushing is based upon the fact that the Cushing's stern never left the first course she was on, and while her bow swung to starboard through an arc of two points. The Cushing's bow was therefore about 2,500 feet behind the point of collision when the Proteus ported, and the vessels were then about 4,000 feet apart; the Proteus being a little more than a point and a half on the Cushing's starboard bow.

Below, the Proteus was held at fault for failing to sound her whistle until midway on her swing, and for failing to switch on her lights at once when she began to manuever three minutes before the collision. And the Cushing was held at fault for having the Proteus in full view for 15 minutes and failing either to warn the Proteus of her advance or "put between them a safe distance." It was held that she failed to starboard and give the Proteus more room, when there was still time, and neglected to maintain a sufficient watch on the bridge. She

was further held at fault for assuming that her own visibility was as good as that of the Proteus, when she should have realized that the position of the moon and her own camouflage made it difficult for her to be seen. The court held the situation to be one of passing starboard to starboard, and not of meeting end on.

The fault of the Proteus is plain. We think the court below properly held her at fault. The Proteus was at fault in unnecessarily hard-aporting the helm, in not announcing by signal the extreme helm movement, and in persisting at full speed ahead and hard-aport helm. It was unnecessary, and she was at inexcusable fault in using the helm movement under the circumstances. The Manitoba, 122 U. S. 97, 7 Sup. Ct. 1158, 30 L. Ed. 1095; The Atlantic City, 143 Fed. 451, 74 C. C. A. 585; The Worsley Hall and Ioannis Vatis (House of Lords, Dec. 1919) 1 Lloyd's List Law Reports, 607. The failure of the Proteus to sound a signal blast on the whistle to indicate her change of course to starboard was a violation of article 28 of the rules, and, because it obviously operated to the detriment of the Cushing in her navigation, she cannot avoid the consequences of this wrongful maneuver.

The Proteus had swung as far as two points before the signal announcing her change of course was sounded, and a minute and a half had elapsed before the one-blast signal was sounded after the hard aporting. The failure to sound that signal cannot be attributed to the absence of lights on the Cushing. It was a necessary signal. She also failed to reverse her engines in the face of a known danger, after discovering the close proximity of the Cushing and her course. Apparently the navigators of the Proteus were under the impression that the Cushing was swinging under a starboard helm, which would have necessarily brought the vessels on intersecting courses; but, despite that assumption, the Proteus was continued at full speed of 13½ knots. And the officer in charge said that they did not stop or reverse, "but we were trying to get out of the way." To fail to reverse the engines in the face of danger is sufficient to fasten liability upon the Proteus, to charge it with contributing to the collision. Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751; The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; The Volund, 181 Fed. 643, 104 C. C. A. 373.

We think the Cushing was at fault in not flashing or setting her lights on, and for failing to give the Proteus a wider berth. The officer of the Cushing reports the collision as occurring at 1:05 a. m. He says that the Proteus was under observation from 12:50 a. m. to the time of the collision. When he first sighted her, he could not determine which way she was going. He continued to observe her, however, and noted that her bearings were getting broader on his bow. The vessels at this time were at least 3 miles apart. The navigating officer of the Cushing, by his own testimony, shows he was fully aware of the course of the Proteus. It is conceded that the speed of the two ships was, the Cushing, 12 knots per hour, or 1,217 feet per minute; the Proteus 13½ knots, or 1,370 feet per minute. The combined speed was therefore 2,587 feet per minute. Accepting the estimate of the Cushing's officer of the distance of 3 miles, it was at least 7 minutes before

the collision after he knew the exact course of the Proteus. He had no right to assume that the Proteus had like knowledge with respect to the movements of the Cushing.

It did not have the appearance of a starboard to starboard passing, as argued in behalf of the Cushing. In so far as the Proteus was concerned, the Cushing would appear to be almost dead ahead up to a very short interval of time before the collision. The diagrams indicate this. Any change in the bearing of the Cushing in respect to the Proteus would occur very slowly, because of the fact that the angle between the two courses was only three degrees, and the Cushing had only a few minutes before it passed the point of convergence of the two courses. If the Proteus and the Cushing had been running with lights, the Proteus, up to a comparatively short time before the collision, would have been showing both side lights to the Cushing, and the Cushing would have been showing only her green lights to the Proteus. If, however, the ships had been running without lights, the observers of the Proteus would have seen the Cushing almost dead ahead; whereas, the observers of the Cushing would have seen the Proteus slightly on their starboard bow.

This situation should have been recognized as vessels approaching in a dangerous situation and in such case involved the risk of collision. Even with lights, it would have been a dangerous situation, and, of course, one of greater danger when the ships were running without lights, in view of the fact that the obvious purpose of running without lights was to destroy a ship's visibility and to prevent observers on other ships from taking proper bearings. The vessels were in such a situation that those on the Proteus would either, because of the absence of light, not see the Cushing at all, or would see her dead ahead. Those on the Cushing, when they saw the Proteus, saw her on the Cushing's starboard bow; the bearings of the Proteus from the Cushing must have been much finer than that estimated by the witnesses called on behalf of the Cushing. It would seem, therefore, impossible to treat the vessels as being in a starboard to starboard situation.

Under these circumstances, prudent navigation would dictate to turn away or run away in plenty of time. The Cushing, having the Proteus under observation for a period of 15 minutes, should either have exhibited her lights or have given the Proteus a wide berth. She was not justified in assuming, as she did assume, that the situation was a starboard to starboard situation, and that those on the Proteus knew that it was a starboard to starboard situation. It must always be remembered that, in addition to running without lights, the Cushing was camouflaged for the purpose of deceiving observers as to her course. In the situation it was known, or should have been known, to her officers, that, if she could have been seen, her camouflage would have given her the appearance of a privileged vessel to observers from the Proteus; hence they should have anticipated a port helm from the Proteus. When the navigating officer of the Cushing elected to hold his course, he was then under a positive duty to show his lights, because he had the Proteus at his peril. If the Proteus should make him out as camouflaged, the Proteus was under the statutory duty to port her

helm. To show his lights would inform the Proteus as to the true bearing and course of the Cushing.

· The happening of the collision speaks of the success due to the absence of lights in lowering the Cushing's visibility, and that of the camouflage in deceiving observers as to her true course. The only danger to the Cushing, in showing her lights, would have been to possibly enable a submarine to determine her true course and direction. It of necessity follows that, if an observer from a submarine could not have determined the Cushing's true course and direction without the aid of lights, an observer from the Proteus could not determine her true course and direction without such aid. We think that, when the Cushing's navigating officer elected to hold his course, knowing that the relative positions of the Cushing and the Proteus were such that his ship would appear to be almost dead ahead of the Proteus, he created an emergency such as was contemplated by the naval authorities, which required showing his lights.

It is no answer to say that the navigator was fearful of submarines at the time. The value of switching on the Cushing's lights can scarcely be questioned. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; Yang-Tsze Ins. Ass'n v. Furness, Withy & Co., 215 Fed. 859, 132 C. C. A. 201. Had the lights been switched on when her navigator and lookout first saw the masts of the Proteus, the appearance of the green light would have warned the navigators of the Proteus of their error, and they could immediately have starboarded or reversed their engines. This unquestionably would have avoided the collision, even without any aid from the Cushing. Indeed, the navigator of the Cushing recognized his duty to turn on the lights; but he did so too late. There was ample sea room, and we think the navigator was clearly at fault in not taking advantage of it. Had the Cushing hard-aported as soon as she saw the Proteus altering her course to starboard, she would have swung to starboard at least eight points, and the vessels would have gone clear by a wide margin.

Likewise, the Cushing was at fault for not stopping and reversing as soon as she saw the Proteus was changing her course. No attempt was made to slow down or stop the engines. The navigator waited a minute or two, and then walked to the wheelhouse and switched on the lights, and then he ordered the helm hard-aported, and finally reversed his engines. Failure to reverse until just before the collision is indicated by the log. Steam vessels must stop their engines in the presence of danger, or even anticipated danger, and the failure to do so has been the cause of condemnation of many vessels, where collisions have occurred. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126. She was also at fault, we think, for failing to blow a whistle under the circumstances. The navigating officer admitted that he did not think the Proteus saw the Cushing. The time to have blown the alarm to give notice to the Proteus was in the early part of the 15 minutes during which the Cushing had the Proteus under observation. We think the evidence clearly establishes these several faults of the Cushing and that she likewise must respond in damages.

[2] The court found the value of the Proteus to be $750,000. Error is assigned in this by the owner of the Proteus, claiming that it has

established a value of $1,225,000. The owner of the Cushing claims the award is excessive. The Proteus was a total loss. The principle governing the computation of damages is that the sufferer by the collision which is the result of wrongdoing, whether by negligence or mistake, is entitled to restitutio in integrum. It is that, as far as practicable, the owner is to be restored to the same pecuniary position as if no collision had taken place, and where a ship is totally lost the owner is entitled to recover the actual value, and this is defined in the admiralty courts to be her market value; that is to say, the gross sum for which she might have been sold immediately before the collision. Lowndes, Admiralty Law, p. 140. This rule was announced in the early case of The Clyde, Swaby, 23, where it was said:

"The value is the market price at the time of the destruction of the property, and the difficulty is to ascertain what would be its market value. * * * In order to ascertain this, there are various species of evidence that may be resorted to; for instance, the value of the vessel when built. But that is only one species of evidence, because the value may furnish a very inferior criterion whereby to ascertain the value at the moment of destruction. The length of time during which the vessel has been used, and the degree of deterioration suffered, will affect the original price at which the vessel was built. But there is another matter infinitely more important than this— known even to the most unlearned—the constant change which takes place in the market. It is the market price which the court looks to, and nothing else, as the value of the property. It is an old saying, 'The worth of a thing is the price it will bring.' "

This rule was cited with approval in Alaska S. S. Co. v. Inland Navigation Co., 211 Fed. 842, 128 C. C. A. 366. It has been approved by other law writers. Roscoe on Damages in Maritime Collisions; Marsdon's Collisions at Sea (6th Ed.); Treatise on the Law of Maritime Collisions, § 200, by Spencer. The rule was approved in Dobree v. Schroeder, 2 My. & Cr. 489 (the High Court of Chancery of England). In The Colorado, Fed. Cas. No. 3,029 (affirmed, without reference to the question of damages, 91 U. S. 692, 23 L. Ed. 379) the correct rule on this subject was said to be that, when the vessel is a total loss, the market value of the vessel just before the collision is the proper measure of damages and that the best evidence of such value is the opinion of competent persons, who knew the vessel shortly before she was lost, and that the next best evidence is the opinion of persons conversant with shipping and the transfer of vessels. It was pointed out that there were exceptions to this rule, as when a vessel lost, because of some peculiarity of construction, is adapted to some special purpose out of the usual course of shipping, the owner is precluded from establishing the market value for her. In such an instance, he may show when the vessel was built for the special trade requiring the peculiar or unusual conditions in her construction, and it was said that the better criterion of that is the cost of construction or purchase price and a deduction for depreciation or ordinary wear and tear. But where the vessel is salable, or where the market price may be shown, the present fair value is the test.

[3] It is pointed out that the Proteus was owned by the Southern Pacific Railroad Company, that she had been requisitioned by the government when the railroad company was taken under federal con-

trol, and that during this period the owner could not have sold her, or would have to sell her subject to control by the government. But, when she was lost, the monetary loss to the owner was her then market value. The act of requisition was at an end, and the loss that of the owner. At that time, if the owner was free to sell her, there was a ready market. At this time, the market value of steamships was very high, due to the war, and the courts have taken notice of such increase in value, as in the salvage case of The Kia Ora, 252 Fed. 507, 164 C. C. A. 423 (Fourth Circuit), and in the arbitration between the Mersey Docks and Harbour Board and the Lords Commissioners of the Admiralty, [1920] 3 K. B. Div. 223, where Lord Reading said:

"In my judgment it is sufficient for the purposes of this case to say that the board are entitled to have the property which, but for the action of the admiralty, would have been in their possession in April, 1919, replaced by the admiralty. As it cannot be replaced, except by the expenditure of money, they are entitled to the amount of money which would represent the cost to them of the replacement. That must be measured with regard to the special circumstances arising from the war, and more especially to the increase in the value of labor and materials which has continued up to the present time."

[4] Assuming, as claimed, there was no market value in August, 1918, because such steamships could not be purchased, because none were on the market, or because it was difficult, if not impossible, to obtain a shipbuilder to construct one, then these special circumstances invoke the rule of damages of cost of production less depreciation.

[5] Evidence was offered on the trial in fixing the value in August, 1918, the date of the loss, of the cost of reproduction, less depreciation. The court below discounted the cost of reproduction, for the reason that it regarded the high prices of 1918 as artificial and fictitious; but the high prices represent actual values. The withdrawal by the belligerents of a large part of their merchant tonnage for commercial pursuits, for war and other public uses, the chartering of neutral ships to them for like purposes, and the heavy toll of merchant ships destroyed by the submarines and other hostile attacks, and commandeering the shipyards for the construction of ships for government purposes, all caused, not only a severe shortage of tonnage available for commercial uses, but disrupted the channels of the trade and caused high prices. It resulted in high freight rates and increased tonnage values. This condition was brought about by the war, and, to be sure, was not expected to survive indefinitely after the war; but there was nothing artificial or fictitious about these prices. They were brought about by unusual economic conditions. The period of high prices lasted for several years during the war period. Evidence was offered by the claimant that in 1917 a joint army and navy board and a board of appraisal of merchant private vessels fixed the value of the steamship Saratoga and the steamship Havana at 2½ times what they cost in 1916, and in arriving at that conclusion, they estimated the cost of reproduction less depreciation.

The Proteus was a steel passenger and freight steamship, equipped with triple expansion engines and Scotch boilers. Her speed was 15 knots; dimensions, 405 feet long, 48 feet beam, 32 feet 9 inches in depth. Her tonnage was 3,006 tons net, 4,836 tons gross, and about

4,000 tons dead weight. She was built in 1900 by the Newport News Shipbuilding Company for use in the Southern Pacific Railroad Company's service between New York and New Orleans, and was so used until taken over by the government. Her original cost was $557,600. In 1909 she was reboilered and otherwise improved at a cost of $90,000. She was unusually well kept, as the court below found. Three experts, one a surveyor and appraiser of 35 years' experience, and the other two the presidents of two of the largest steamship companies in the United States, gave values for the vessel for August, 1918, which justified the claim of $1,225,000. This made due allowance of 2½ per cent. per year for depreciation. There is no fixed rule as to the amount of depreciation to be deducted, but 2½ per cent. is reasonable in application for a period when there was such demand for vessels. Obviously, it might be unreasonable in other periods. The rule has varied between 3 and 5 per cent. for depreciation in tax matters. The Treasury Department Bulletin of January-June, 1920, fixed 2 per cent. as the rate of depreciation on steamships; 2½ per cent. is said by the experts to be used here, because of the unusual high standard of upkeep of the Proteus.

Opposed to this testimony is that of an employé of the owner of the Cushing, connected with the construction department; another, who was a member of the board that appraised the Havana and Saratoga at 2½ times its value at the time of construction; the third expert, who seems to have had nothing to do with the valuation of merchant ships, but who was engaged in the construction of yachts and torpedo boats. We think the greater weight of persuasive testimony favors the proof offered on behalf of the Proteus as to value, and that the rate of depreciation was fair and reasonable under all the circumstances. The valuation fixed for the Proteus as of August 1, 1918, is at twice her original cost, whereas the valuation fixed by the witnesses called by the petitioner is about one-fifth to one-sixth more than her original cost. We are convinced that the valuation fixed by the court below was inadequate, and that convincing testimony requires our accepting the value claimed by the owner of the Proteus.

The decree is modified, by holding the value of the Proteus at $1,225,000, and, as thus modified, it is affirmed.

Decree modified.