**THE PETAR.**

**OZANIC v. UNITED STATES, and consolidated causes.**

District Court, S. D. New York.

July 3, 1946.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for libellant.

John F. X. McGohey, U.S. Atty., of New York City (Edward L. Smith, of New York City, of counsel), for respondent.

LEIBELL, District Judge.

On March 8, 1942, the Yugoslavian steamer "Petar" was sunk in the Caribbean Sea as a result of a collision with the United States tanker "Kennebec." At the time of the collision the "Petar" was carrying cargo and was operating under a time charter. The possession and use of the vessel had been requisitioned by the Yugoslav government and she was subject to Yugoslav and British restrictions. The crew were under a union contract by which the owner was obliged to pay to the survivors of the crew wages, maintenance and travel expenses for repatriation. After the collision the "Kennebec" stood by to render assistance and in the operation her motor whaleboat became damaged and was lost.

On August 5, 1942, Bozidar Izanic, as Master of the steamship Petar, filed a libel in this court against the United States. Subsequently consolidated therewith were a cross-libel by the United States for the damage sustained by the Kennebec and for the loss of her motor whaleboat, and a libel against the United States by the insurer of the Petar's cargo of bauxite. Pursuant to a stipulation of the parties and on motion of this libellant a decree of this court was entered adjudging that the United States should pay two-thirds of the damages caused by the collision and the remaining one-third should be paid by the owners of the Petar. The value of the cargo including freight ($27,852), the personal effects of the survivors ($11,428.86), and extra equipment and supplies of the Petar ($5,872.27), as well as the damage to the Kennebec ($11,119.62) were fixed by agreement of the parties. The remaining items of damage, which were in dispute, were referred to a Commissioner who found that:

1. The value of the "Petar" on March 8, 1942, the date of the sinking, was $170,-000.

2. The libellant was not entitled to any recovery for the loss of profits which would

otherwise have been earned under the time charter.

3. The libellant was not entitled to recover the repatriation expenses of the survivors, for wages, maintenance and transportation.

4. The respondent was not entitled to any recovery for the loss of its motor whaleboat.

The libellant excepts to the Commissioner's findings in respect to the value of the Petar (claiming a value of $210,000), and to the denial of recovery for the loss of profits (charter hire of $12,746.22), and to the denial of repatriation expenses ($10,-277.61), covering wages, maintenance and costs of transportation of seven survivors (3 to Georgetown, British Guiana and 4 to New York City). The respondent excepts to the findings in respect to the value of the Petar, claiming a value of $93,000, and to the denial of recovery for the loss of the motor whaleboat, valued at $2,500.

As the Commissioner reported:

"The principal issue in this case, * * * was the value of the PETAR. Constructed in Holland in 1910, she was nearly 32 years old when she sank. A small steel cargo steamer, in class and operating condition, and fitted for trans-Atlantic service, she was engaged in the bauxite trade between Georgetown and St. Thomas when she sank. At the time of her loss she was registered under the Yugoslavian flag and her use had been requisitioned by that government."

The Petar was of the three island type, having an overall length of 265 feet, 39 foot beam, and a depth of 18.7 feet; she was of 2787 deadweight tons measured by her peacetime Plimsoll marks, 2850 by wartime Plimsoll marks. She was powered by steam, had two Scotch coal-burning boilers, reciprocating triple expansion engines—about 1200 Horse Power under normal operating steam pressure of 180 pounds. She was a single screw steamer and was chartered as a nine knot ship, and she averaged 8.84 knots in all types of weather. Lloyds gave her the top classification of +100 A 1.

The maxim restitutio in integrum expresses the principle governing the computation of damages adopted in collision cases in admiralty. If a vessel is totally lost the measure applied to restore the owner to the same position he was in before the collision is the market value of the vessel at the time of her total destruction; "that is to say, the gross sum for which she might have been sold immediately before the collision." The Cushing, 2 Cir., 292 F. 560, at page 566. A vessel may be lost in a period when market value cannot be determined by the established method of referring to contemporaneous sales of like vessels in the ordinary way of business. Extraordinary conditions exist during times of war, when there is a great demand for vessels but practically no open market and no comparable sales, due to government requisition.

The problem of valuation under such conditions was presented in Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 467, 69 L.Ed. 890, and the Court held that in the absence of market value, the damages to which an injured party is entitled in admiralty for the loss of a vessel is that amount which probably could have been obtained for her, considering all the circumstances, on the date of the collision; "the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy." At page 156 of 268 U.S., at page 467 of 45 S.Ct., 69 L. Ed. 890, the Court stated: "It is to be borne in mind that value is the thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." The Supreme Court affirmed the decision of the Circuit Court of Appeals, Second Circuit, which had held that if, at the time of loss of a vessel, there "was no market value * * * because such steamships could not be purchased, because none were on the market, or because it was difficult, if not impossible, to obtain a shipbuilder to construct one, then these special circumstances invoke the rule of damages of cost of production less depre-

ciation." The Cushing, 292 F. 560, at page 567.

Another case which dealt with the wartime valuation of a vessel was The Hisko, 2 Cir., 54 F.2d 540, 541. That court followed the rule of the Supreme Court in the Standard Oil-Southern Pacific case and held that "Reconstruction cost less depreciation for age is not an absolute measure of a vessel's value, but only one of the relevant facts, all of which must be considered in arriving at a fair judgment of value; nevertheless, under such conditions as were shown to exist in the Proteus case and in the case at bar (The Almirante), reconstruction cost less proper depreciation may be deemed a reliable indication of the minimum value."

It is obvious from the rule of these cases that when a vessel is lost as a result of collision during a time of war when there is no open market to determine value, then the market value must be determined from all the available circumstances and relevant facts, giving consideration to their proper weight and bearing. The supplementary questions of relevancy and weight are not as clearly defined as the general rule. In Standard Oil Co. of New Jersey v. Southern Pacific Co., supra, the court found that the cost of reproduction in a period of high costs, prices and wages was a relevant factor, and that proper depreciation was a relevant fact, considered in relation to reproduction costs. The court excluded original cost of the vessel as a relevant factor or useful guide in determining value, because of changed prices and enhanced values brought about by the influence of war.

In the same case in the Circuit Court of Appeals (The Cushing, supra) that court excluded from consideration the fact that the vessel was operating under government requisition and that the owner "could not have sold her, or would have to sell her subject to control by the government." The court observed that when she was lost the act of requisition was at an end and the loss was that of the owner and that the monetary loss to the owner was her then market value. Mersey Docks and Harbor Board, 3 K.B.Div. 223, was cited and quoted from to support this view. Orig-

inal cost, under the special circumstances presented, was considered a very inferior criterion. It clearly would be unfair in the case at bar as the base to be depreciated. The original cost of the Petar was about $171,000 in 1910. She was sold in 1932 for $16,262. She was purchased by her last owner for $33,629 in June 1936.

In The Hisko, supra, the court also held that the American reconstruction cost of a foreign built vessel was competent evidence on the issue of the vessel's value, because "under the abnormal conditions of September, 1918, there was a demand for cargo vessels, regardless of where they were built, which gave them a value, if they could have been sold, greater than their reproduction cost in an American yard." In the report of the Advisory Board on just compensation to the War Shipping Administration (December 7, 1943), the Board in Rule 2 stated: "In the case of requisition of foreign flag vessels under Public Law 101, 50 U.S.C.A.Appendix, § 1271 et seq., just compensation should be determined as in the case of domestic vessels."

Some other factors which must be subjected to the test of relevancy, competency and weight are the value placed on a vessel for insurance, the earning capacity of the ship and the manner in which the ship has been kept up. The cases seem to hold that the insurance value, stated in a policy, is not relevant in determining the true or market value of any type of property, including vessels, because it may be arrived at for various business reasons, and does not represent actual value. "The theory and practice of insurers and insured is to make the limit of insurance much less than the value of the property, while owners are permitted to procure insurance in amounts far below this limit. The result is that the amount of insurance has no fixed or uniform relation to the value of the property it covers, and hence does not directly tend to disclose its value." Union Pacific R. Co. v. Lucas, 8 Cir., 136 F. 374, 377; Adelphia Hotel Co. v. Providence Stock Co., 3 Cir., 277 F. 905; Roscoe, Damages in Marine Collisions, 35. In The Hisko, supra, the disproportion between the insured value and the recovery allowed by the court indicates the irrelevancy of the insurance

value factor, at least during World War I. Recovery was allowed for the sum of $1,750,000 although the ship was insured on valued policies for only about $600,-000. See Robinson, Admiralty § 114, n. 136. The Advisory Board, above referred to, mentioned in Rule 3, "appraisals for insurance or other purposes" as an element to be considered, in the absence of an open market value. The Board used the word "appraisals."

The earning capacity of a ship at the time of loss or the profits which have been previously earned are some evidence tending to prove value, but the varying facts of use, business acumen, and management which go to influence this factor, detract from the weight which should be given to this element. Roscoe, Damages in Marine Collisions, 35. But "a general rise in prices or earnings, whenever occurring" is an element of enhancement of value that should not be discounted; at least Rule 4 of the Advisory Board so indicates. The Petar was earning about $45,000 a year net at the time she was sunk. (From April 6, 1941, to March 8, 1942, she earned $40,-780.54 net.)

█ The Advisory Board was composed of three judges from the United States Circuit Courts of Appeals, appointed under Executive Order No. 9387, dated October 15, 1943, 50 U.S.C.A.Appendix, § 1295 note. The rules it laid down were "for the guidance of the War Shipping Administration in determining the just compensation to be paid for all vessels requisitioned, purchased, chartered or insured by the Administration." They did not assume to set up any new rule of damages for collision cases where a vessel was a total loss, or to supersede the rules of the leading cases hereinabove discussed. But much of the material found in the Advisory Board's rules is useful in determining the value of a vessel lost through collision during World War II. Rule 3 of the Advisory Board's Report states that:

"Where market value cannot be determined by sufficient sales or hirings of vessels of like character, made at or about the time of taking, it is to be determined by the Administrator from a consideration of cost of construction, acquisition cost so far as relevant, improvements, replacement costs, depreciation, earnings, physical condition, appraisals for insurance or other purposes, and any other relevant facts upon which a reasonable judgment for value can be based. These various matters are to be given such weight by the Administrator, as in his opinion they are justly entitled to, in determining the price that would probably result from fair negotiations between an owner willing to sell and a purchaser desiring to buy."

And Rule 4 provides:

"From the value at the time of taking, there should be deducted any enhancement due, to the Government's need of vessels which has necessitated the taking, to the previous taking of vessels of similar type, or to a prospective taking, reasonably probable, whether such need, taking, or prospect, occurred before or after the declaration of the national emergency of May 27, 1941. Enhancement due to a general rise in prices or earnings, whenever occurring, should not be deducted. In the application of this rule neither the proclamation of limited emergency of September 8, 1939, nor the facts existing at that time, are in themselves of significance. The Board does not determine whether any enhancement after May 27, 1941, other than as enumerated above as deductible, should be excluded; since the Board is advised that the value of ocean-going vessels was higher on May 27, 1941, than at the time of taking, and that any enhancement since May 27, 1941, in vessels of other types, not deductible under the foregoing, is attributable to a general rise in prices or earnings, and should therefore not be deducted."

The report of the Commissioner herein, filed March 8, 1946, found the value of the Petar to be $170,000 as of March 8, 1942, and the Commissioner states that the $170,-000 valuation is a "composite based on all the evidence." He found that "due to war conditions there was no open market and no comparable sales" as of March 8, 1942; that on that date "the only ships constructed in this country were being built exclusively on a multiple ship basis"; that the reproduction cost of the Petar new in

the United States at the time of the collision, on a multiple ship basis, was about $500,000. There is no substantial dispute as to these findings. In arriving at a value of $170,000 as of March 8, 1942, the Commissioner gave due consideration to the testimony of libellant's experts in support of a 2½% depreciation rate, but he did not limit himself to that rate. That rate was the same as the rate used by appraisers for a similar period, World War I. The Cushing, supra. It was also the rate used generally by appraisers in New York in 1942. Bagger, one of libellant's experts, with 29 years experience in appraising vessels, testified that in determining the Petar's value as of March 8, 1942, he took the American reproduction cost on the multiple ship basis, $470,000, for a ship of the same size and type, and deducted therefrom for each year progressively a sum equal to 2½% for 32 years. Using the residual factor of .444 he arrived at a figure of $210,000 (Ex. 18). Haight, libellant's other expert, used the same depreciation rate of 2½%, but used a higher reproduction cost.

The percentage of depreciation used by two of respondent's experts, Sturm and Hodges, was 5% applied to American reproduction cost figures on a single ship basis; but, as the evidence indicates, that was representative of the rate of depreciation used in normal peace times, if no market price based on sales could be ascertained.

Respondent's third expert (Stanley) took the original cost of the Petar and deducted therefrom yearly an age differential of 5%, except that during the first and second World War periods he added 5% to her yearly value. This method was original and unsupported by any precedent. The conditions created by the war necessarily made for a lower rate of depreciation than this. Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 159, 45 S.Ct. 465, 69 L.Ed. 890.

The Commissioner apparently applied three factors which were deemed to increase the rate of depreciation over the libellant's 2½% rate. One was the fact that the ship's use was requisitioned and she could not be sold without the consent of the Yugoslav and British governments.

Such a circumstance, it has been held, does not operate to reduce the value. The Cushing, 2 Cir., 292 F. 560, 566, 567. The next depressing factor he considered was the fact that the rates of hire and the use of the vessel were controlled under government restrictions. It does not appear how restrictive this rate control was or how it compared with that used in World War I, except that it was admittedly greater. The Commissioner states "that shipping in World War II was subject to much greater controls than in World War I." It appears, however, that during World War II the demand for ships was greater and the supply less than during World War I. One expert witness, Bagger, who was familiar with conditions during both periods, testified that this fact offset the depressive effect of more stringent control. The third element on the reductive side of the scale of value, in the opinion of the Commissioner, was the fact that War Risk Insurance, as fixed by the government, was lower and could not be obtained for a greater amount; and there was the danger of sinking by enemy action.

While as has been observed, insurance policy value is not a probative factor in determining market value, it would appear, as the respondent has argued, that during a time of war when there actually exists a high rate of sinkings, the amount of insurance that would be paid to an owner if his vessel were lost would be a factor that would be considered by a prospective buyer. Such a consideration would result in reducing the price he would otherwise offer. However, that depressive factor must also be measured in the light of the admitted fact that the demand for vessels was greater and the supply less, than during any other economic period. The Petar's war risk insurance at the time of the sinking was $156,200 as against a war risk insurance of $200,000 carried just prior to the requisition of the Petar. The new war risk insurance was about 78% of the old.

The libellant's proctors argue that in arriving at a valuation of $170,000, the Commissioner failed to follow the decisions of the appellate court in the Standard Oil Co. case, The Cushing-The Proteus case, supra, which allowed 2½% depreciation,

and in the Hisko case, supra, and failed to give proper weight to the testimony of libellant's expert witnesses, Bagger and Haight. Libellant's proctors state in their brief:

"It is our contention that the Commissioner could not and should not have reached any valuation or attempted to determine how the question of valuation was affected by these factors when he himself did not have the technical knowledge or experience or the necessary testimony in the record to come to any proper conclusion. * * * He should then have accepted the testimony of the witnesses with the greater experience, qualifications and competency and should have accepted their conclusion as to the value to be given to the 'Petar' * * *. the Commissioner should have accepted the valuations of Bagger and Haight as far more competent, experienced and qualified appraisers."

■ Many of the judges who review the reports of commissioners on the value of a vessel lost in a collision, are lacking in technical knowledge or experience. They are not experts, although they may have acquired some knowledge on the subject through hearing admiralty cases. If "necessary testimony" was absent from the record in the present case whose fault was that? Over 600 pages of testimony were taken. Counsel should have been able to cover every issue thoroughly in a record of that size. The Commissioner was not bound by the testimony of any of the experts. Expert testimony was for his guidance as the trier of the facts, and was to be weighed and considered by him the same as other relevant testimony. The Commissioner possessed all the power of a master in chancery. Admiralty Rule 43, 28 U.S.C.A. following section 723.

■■ The findings of a Commissioner in respect to the value of a vessel lost in collision are entitled to great respect and they should not be set aside unless it appears that the valuation is manifestly erroneous as in conflict with the weight of the evidence, or unless there is a clear mistake in the process by which the valuation was reached. The Gertrude, D. C., 112 F. 448; The Mobila, D.C., 147 F. 882. Although the report is treated as presumptively correct, the court will carefully review the report and when an error has been committed the court may modify or reject the report, in whole or in part, when the court in the exercise of its judgment is fully satisfied that error has been committed. Rule 43½, Admiralty Rules. The Ida G. Farren, D. C., 127 F. 766, 776; The Spica, 2 Cir., 289 F. 436.

■ The evidence before the Commissioner consisted of 632 pages of testimony and 59 exhibits. The report indicates that he gave all the issues thorough and careful consideration. He saw and heard the witnesses testify. If I had sat in the case in the first instance, I would not have found any lower value for the Petar than the figure he set, $170,000. I might have allowed between 5% and 10% more. I cannot say that the Commissioner's valuation was not correct, or that he committed any error. I think he turned in a very creditable report. At best, valuations under the conditions existing in March 1942 were approximations, based on a "careful analysis" of many factors. The Commissioner's report as to the value of the Petar is affirmed.

The Commissioner found, on the authority of The Amiable Nancy, 3 Wheat. 546, 16 U.S. 546, 4 L.Ed. 456; The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The George W. Roby (In re Lakeland Transp. Co.), D. C., 103 F. 328 at 335 and 6 Cir., 111 F. 601 at 615; The Hamilton, D. C., 95 F. 844, that the loss of future profits under the charter was not a recoverable item of damage. Libellant's proctors argue that the decisions in the cases of The Umbria and The Amiable Nancy held merely that profits arising under a charter, the performance of which had not as yet been entered upon, were not recoverable. In The Amiable Nancy libellant sought damages "for the loss of the supposed profit of the voyage on which The Amiable Nancy was originally bound." Mr. Justice Story wrote: "The probable or possible benefits of a voyage, as yet in fieri, can never afford a safe rule by which to estimate damages, in cases of marine trespass." In the case of The Umbria, which involved a claim for loss of profits on a charter to be entered upon on the re-

turn crossing, Mr. Justice Brown stated the general rule [166 U.S. 404, 17 S.Ct. 617] "that in cases of total loss by collision damages are limited to the value of the vessel, with interest thereon, and the net freight pending at the time of the collision." In the case of The Hamilton it was held that "It is immaterial that the charter party has been entered upon." See also The Menominee, D. C., 125 F. 530.

In the case at bar the charter covered a number of voyages to be made between Georgetown and St. Thomas, in the West Indian Shuttle Service, during a period of three months from February 27, 1942—not just one voyage. The Bill of Lading required the shipper to pay the full freight, whether the vessel was lost or not. The cargo owner, by stipulation, will recover the freight, $16,085.88, from the respondent, so that the libellant receives all the freight of that voyage and the respondent pays it. There must be a reasonable certainty of gain as the basis of the claim for loss of profits and such profits as might be earned under a charter, subject as they are to various contingencies, are deemed too remote to admit of recovery. The Commissioner's report denying the item of lost charter profits is affirmed.

After the collision which resulted in the total loss of the Petar, that vessel's owner paid the expenses of surviving members of the crew—wages, maintenance and transportation by way of repatriation. The owner was obliged to make such payments by virtue of an arrangement entered into between the representative of the Yugoslavian Government and the Seamen's union. The Commissioner has denied the libellant recovery for these repatriation expenses. Where a ship is a total loss, the expenses of transporting and maintaining the crew is sometimes incurred. In such circumstances they are recoverable against the wrongdoer as part of the damages sustained by the libellant only if the law of the country to which the ship belongs gives a right of recovery to the seaman or his government. Roscoe, Damages in Marine Collisions, 49, 50. The burden of showing the law of the flag rests upon the libellant and the record is bare of any proof or evidence of the law of Yu-

goslavia. In the absence of any law of the State imposing this duty on the owner the general rule has been that the owner's obligations, in the case of total loss, cease at that time. Since 1792 the statutes of the United States have made provision for the return of destitute seamen to this country upon suitable action taken by consular officers of the United States. Alaska Steamship Co. v. United States, 290 U.S. 256 at page 260, 54 S.Ct. 159, 78 L.Ed. 302. The duty of the owner to pay such expenses in this case arises from the contract with the union, to which the respondent was not a party, and it does not appear that the owner's contract was known to the respondent. The payments are not the direct, probable and foreseeable consequences of the act of negligence resulting in the collision. The Federal No. 2, 2 Cir., 21 F.2d 313; Brown v. Pillow, 2 Cir., 174 F. 967. These principles apply with equal force to the claim for wages. The Commissioner's report is affirmed in its denial of any recovery for the libellant's expenditures for repatriation and for wages, paid after loss of the vessel.

The last finding, to which the respondent takes exception, denies recovery to the respondent for the loss of its motor-whaleboat, valued at $2,500. The respondent argues that the damage to the lifeboat was a foreseeable consequence of the collision, even though respondent's own negligence in lowering the boat intervened. The Commissioner's report on this item is as follows:

"It was conceded at the hearing that libellant could produce an expert who would testify that the boat was lowered in an improper, careless and negligent manner, but objection was made that such evidence was immaterial. Decision was reserved at the hearing. This objection is overruled. The question presented is whether such negligent handling of the lifeboat was beyond the range of reasonable expectation or so unlikely as to break the causal chain. I find negligence of such a character as to destroy the chain of proximate causation between the collision and the loss of the lifeboat. There were a number of acts in connection with the lowering of the boat, which, in my judgment, constituted negligence so extraordinary and unusual, and

304

in such disregard of every rule of prudence to be beyond the horizon of ordinary foresight. The Algonquin, 2 Cir., 70 F.2d 335." That conclusion was reached by the Commissioner on a consideration of all the evidence properly before him, which showed that respondent was guilty of extraordinary negligence (see in particular Ex. A–1), and so was barred from a recovery under well established principles of law. The Commissioner's finding will not be disturbed by the court.

No objection has been made to the Commissioner's application for an allowance of $2,500. That amount seems to be proper. The hearings took 35 hours of his time. The testimony covered 660 pages of typewritten minutes. There were 59 exhibits introduced in evidence. The briefs were lengthy, as on this motion. The Commissioner employed 75 hours in preparing his report. His allowance will be paid two-thirds by the respondent and one-third by the libellant, as per stipulation.

Upon a consideration of the testimony, exhibits and the law, the exceptions to the Report of the Commissioner are overruled and his report is in all respects affirmed. Settle a final decree accordingly on five days' notice.